## UNITED STATES v. MacDONALD

No. 80–1582.   Argued December 7, 1981—Decided March 31, 1982

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 11. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 12.

*Alan I. Horowitz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey, John Fichter DePue*, and *Brian M. Murtagh*.

*Ralph S. Spritzer* argued the cause for respondent. With him on the brief were *Bernard L. Segal* and *Michael J. Malley*.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the time between dismissal of military charges and a subsequent indictment on civilian criminal charges should be considered in determining whether the delay in bringing respondent to trial for the murder of his wife and two children violated his rights under the Speedy Trial Clause of the Sixth Amendment.

I

The facts in this case are not in issue; a jury heard and saw all the witnesses and saw the tangible evidence. The only point raised here by petitioner involves a legal issue under the Speedy Trial Clause of the Sixth Amendment. Accordingly, only a brief summary of the facts is called for. In the early morning of February 17, 1970, respondent's pregnant wife and his two daughters, aged 2 and 5, were brutally murdered in their home on the Fort Bragg, N. C., military reservation. At the time, MacDonald, a physician, was a captain in the Army Medical Corps stationed at Fort Bragg. When the military police arrived at the scene following a call from MacDonald, they found the three victims dead and MacDonald unconscious from multiple stab wounds, most of them superficial, but one a life-threatening chest wound which caused a lung to collapse.

At the time and in subsequent interviews, MacDonald told of a bizarre and ritualistic murder. He stated that he was asleep on the couch when he was awakened by his wife's screams. He said he saw a woman with blond hair wearing a floppy hat, white boots, and a short skirt carrying a lighted

candle and chanting "acid is groovy; kill the pigs."[1] He claimed that three men standing near the couch attacked him, tearing his pajama top, stabbing him, and clubbing him into unconsciousness. When he awoke, he found his wife and two daughters dead. After trying to revive them and covering his wife's body with his pajama top, MacDonald called the military police. He lost consciousness again before the police arrived.

Physical evidence at the scene contradicted MacDonald's account and gave rise to the suspicion that MacDonald himself may have committed the crime.[2] On April 6, 1970, the Army Criminal Investigation Division (CID) advised MacDonald that he was a suspect in the case and confined him to quarters. The Army formally charged MacDonald with the three murders on May 1, 1970. In accordance with Article

---

[1] A woman generally within this description was apparently seen by the military police as they rushed to answer respondent's call. During the course of this case, considerable suspicion has been focused upon Helena Stoeckley. Stoeckley was 19 at the time and a heavy user of heroin, opium, mescaline, LSD, marihuana, and other drugs; within days after the crime she began telling people that she was involved in the murder or that she at least had accompanied the murderers and watched them commit the crimes. She also wore mourning dress and displayed a funeral wreath on the day of the victims' funeral. The investigation confirmed that she had been seen returning to her apartment at 4:30 on the morning following the killings in the company of men also generally fitting the descriptions given by MacDonald. Stoeckley testified at trial that she had no memory of the night in question because she was "stoned" that night. She did, however, admit that at the time of the crime she owned and frequently wore a blond wig and a pair of white boots and that she destroyed them within a few days after the crime because they might connect her with the episode.

[2] Threads from MacDonald's pajama top, supposedly torn in the living room, were found in the master bedroom, some under his wife's body, and in the children's bedroom, but not in the living room. There were 48 puncture holes in the top, yet MacDonald had far fewer wounds. The police were able to identify the bloodstains of each victim, and their location did not support MacDonald's story. Blood matching the type of MacDonald's children was found on MacDonald's glasses and pajama top. Fragments of surgical gloves were found near the bodies of the victims; the gloves from which those fragments came were found under a sink in the house.

32 of the Uniform Code of Military Justice, 10 U. S. C. § 832, the Commanding General of MacDonald's unit appointed an officer to investigate the charges. After hearing a total of 56 witnesses, the investigating officer submitted a report recommending that the charges and specifications against MacDonald be dismissed. The Commanding General dismissed the military charges on October 23, 1970. On December 5, 1970, the Army granted MacDonald's request for an honorable discharge based on hardship.[3]

At the request of the Justice Department, however, the CID continued its investigation. In June 1972, the CID forwarded a 13-volume report to the Justice Department recommending further investigation. Additional reports were submitted during November 1972 and August 1973. Following evaluation of those reports, in August 1974, the Justice Department presented the matter to a grand jury. On January 24, 1975, the grand jury returned an indictment charging MacDonald with the three murders.

Prior to his trial in Federal District Court,[4] MacDonald moved to dismiss the indictment, in part on the grounds that the delay in bringing him to trial violated his Sixth Amendment right to a speedy trial. The District Court denied the motion, but the Court of Appeals allowed an interlocutory appeal and reversed, holding that the delay between the June 1972 submission of the CID report to the Justice Department and the August 1974 convening of the grand jury violated MacDonald's constitutional right to a speedy trial. *MacDonald* v. *United States*, 531 F. 2d 196 (CA4 1976). We granted certiorari and reversed, holding that a criminal defendant could not appeal the denial of a motion to dismiss on Speedy Trial Clause grounds until after the trial had been completed. *United States* v. *MacDonald*, 435 U. S. 850 (1978).

---

[3] MacDonald's discharge barred any further military proceedings against him. *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955).

[4] The District Court had jurisdiction because the crimes were committed on military property. 18 U. S. C. §§ 7(3), 1111.

MacDonald was then tried and convicted on two counts of second-degree murder and one count of first-degree murder. He was sentenced to three consecutive terms of life imprisonment. On appeal, a divided panel of the Fourth Circuit again held that the indictment violated MacDonald's Sixth Amendment right to a speedy trial and dismissed the indictment. 632 F. 2d 258 (1980).[5] The court denied rehearing en banc by an evenly divided vote. 635 F. 2d 1115 (1980).

We granted certiorari, 451 U. S. 1016 (1981), and we reverse.[6]

## II

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." A literal reading of the Amendment suggests that this right attaches only when a formal criminal charge is instituted and a criminal prosecution begins.

In *United States* v. *Marion*, 404 U. S. 307, 313 (1971), we held that the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused:

"On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused,

---

[5] In addition to the Speedy Trial Clause issue, MacDonald raised a number of issues involving the conduct of the trial and rulings of the trial judge. He also claimed that the delay in bringing him to trial resulted in a denial of his Fifth Amendment due process rights. The Court of Appeals declined to reach those issues. Accordingly, we do not decide those issues, instead leaving them for the Court of Appeals on remand.

[6] Our analysis of the speedy trial claim is not to be influenced by consideration of the evidentiary basis of the jury verdict. The jury that heard all of the witnesses and saw the evidence unanimously decided that respondent murdered his wife and children. Respondent does not challenge the jury verdict itself.

nor would they seem to require the Government to dis-
cover, investigate, and accuse any person within any
particular period of time.  The Amendment would ap-
pear to guarantee to a criminal defendant that the Gov-
ernment will move with the dispatch that is appropriate
to assure him an early and proper disposition of the
charges against him."

In addition to the period after indictment, the period be-
tween arrest and indictment must be considered in evaluat-
ing a Speedy Trial Clause claim. *Dillingham* v. *United
States*, 423 U. S. 64 (1975).  Although delay prior to arrest
or indictment may give rise to a due process claim under the
Fifth Amendment, see *United States* v. *Lovasco*, 431 U. S.
783, 788–789 (1977), or to a claim under any applicable stat-
utes of limitations, no Sixth Amendment right to a speedy
trial arises until charges are pending.

Similarly, the Speedy Trial Clause has no application after
the Government, acting in good faith, formally drops
charges.  Any undue delay after charges are dismissed, like
any delay before charges are filed, must be scrutinized under
the Due Process Clause, not the Speedy Trial Clause.[7]

The Court identified the interests served by the Speedy
Trial Clause in *United States* v. *Marion, supra,* at 320:

"Inordinate delay between arrest, indictment, and trial
may impair a defendant's ability to present an effective

---

[7] Our holding agrees with the determination made by Congress in enact-
ing the Speedy Trial Act of 1974, 18 U. S. C. § 3161 *et seq.*  The Act, in-
tended "to give effect to the sixth amendment right to a speedy trial . . . ,"
S. Rep. No. 93–1021, p. 1 (1974), provides that if charges are initially dis-
missed and later reinstated, the period between the dismissal and the rein-
statement is not to be included in computing the time within which a trial
must commence.  18 U. S. C. §§ 3161(d), 3161(h)(6).

Most of the Courts of Appeals considering this issue have also reached
the conclusion that the period after dismissal of initial charges is not in-
cluded in determining whether the Speedy Trial Clause has been violated.
See, *e. g., United States* v. *Hillegas*, 578 F. 2d 453, 457–458 (CA2 1978);

defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."

See also *Barker* v. *Wingo,* 407 U. S. 514, 532–533 (1972).

The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

Once charges are dismissed, the speedy trial guarantee is no longer applicable.[8] At that point, the formerly accused is, at most, in the same position as any other subject of a crimi-

---

*Arnold* v. *McCarthy,* 566 F. 2d 1377, 1383 (CA9 1978); *United States* v. *Martin,* 543 F. 2d 577 (CA6 1976), cert. denied, 429 U. S. 1050 (1977); *United States* v. *Bishton,* 150 U. S. App. D. C. 51, 55, 463 F. 2d. 887, 891 (1972). The Fifth Circuit reached a seemingly contrary result in *United States* v. *Avalos,* 541 F. 2d 1100 (1976), cert. denied, 430 U. S. 970 (1977). However in that case the court relied on unusual facts; the Government dismissed charges pending in one district in order to prosecute the defendants on those same charges in another district.

In none of the cases cited in the dissenting opinion, *post,* at 17–18, n. 2, from the First, Seventh, or Tenth Circuits did the Court of Appeals consider or discuss the issue before us.

[8] *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967), is not to the contrary. There, under an unusual state procedure, a prosecutor was able to suspend

nal investigation. Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life. This is true whether or not charges have been filed and then dismissed. This was true in *Marion*, where the defendants had been subjected to a lengthy investigation which received considerable press attention.[9] But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending. After the charges against him have been dismissed, "a citizen suffers no restraints on his liberty and is [no longer] the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer." *United States* v. *Marion*, 404 U. S., at 321. Following dismissal of charges, any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation.

## III

The Court of Appeals held, in essence, that criminal charges were pending against MacDonald during the entire period between his military arrest and his later indictment on civilian charges.[10] We disagree. In this case, the homicide charges initiated by the Army were terminated less than a

---

proceedings on an indictment indefinitely. The prosecutor could activate the charges at any time and have the case restored for trial, "without further order" of the court. *Id.*, at 214. The charges against the defendant were thus never dismissed or discharged in any real sense so the speedy trial guarantee continued to apply.

[9] The *Marion* defendants were charged with operating a fraudulent home improvement business. The Court noted that the Washington Post ran a series of articles about the ongoing investigation of the business, and reported that the local United States Attorney predicted that indictments would be forthcoming. *United States* v. *Marion*, 404 U. S., at 309.

[10] The original Court of Appeals decision concluded "that MacDonald's military arrest was the functional equivalent of a civilian arrest" for Speedy Trial Clause purposes. *United States* v. *MacDonald*, 531 F. 2d 196, 204 (CA4 1976). Judge Craven, dissenting, disagreed with that con-

year after the crimes were committed; after that, there was no criminal prosecution pending on which MacDonald could have been tried until the grand jury, in January 1975, returned the indictment on which he was tried and convicted.[11] During the intervening period, MacDonald was not under arrest, not in custody, and not subject to any "criminal prosecution." Inevitably, there were undesirable consequences flowing from the initial accusation by the Army and the continuing investigation after the Army charges were dismissed. Indeed, even had there been no charges lodged by the Army, the ongoing comprehensive investigation would have subjected MacDonald to stress and other adverse consequences. However, once the charges instituted by the Army were dismissed, MacDonald was legally and constitutionally in the same posture as though no charges had been made.[12] He was free to go about his affairs, to practice his profession, and to continue with his life.

---

clusion, stating that the military proceedings were equivalent to a grand jury investigation followed by a failure to file an indictment. *Id.*, at 209. In its petition for certiorari, the Government expressly declined to raise the issue of whether the military investigation triggered MacDonald's Sixth Amendment rights; we therefore do not express any opinion on that issue.

[11] The initial Court of Appeals panel held that the prosecution by the Army and that by the Justice Department were conducted "by the government in its single sovereign capacity . . . ." *Id.*, at 204. Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign.

[12] There is no allegation here that the Army acted in bad faith in dismissing the charges. This is not a case where the Government dismissed and later reinstituted charges to evade the speedy trial guarantee. The Army clearly dismissed its charges because the Commanding General of MacDonald's unit, following the recommendation of the Article 32 investigating officer, concluded that they were untrue.

There is nothing to suggest that the Justice Department acted in bad faith in not securing an indictment until January 1975. After the Army dismissed its charges, it continued its investigation at the request of the

The Court of Appeals acknowledged, and MacDonald concedes, that the delay between the civilian indictment and trial was caused primarily by MacDonald's own legal manuevers and, in any event, was not sufficient to violate the Speedy Trial Clause. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE STEVENS, concurring in the judgment.

For the reasons stated by JUSTICE MARSHALL in Part II of his opinion, I also conclude that MacDonald's constitutional right to a speedy trial was not suspended during the period between the Army's dismissal of its charges in 1970 and the return of the civilian indictment in 1975. JUSTICE MARSHALL also is clearly correct in stating that the question whether the delay was constitutionally unacceptable is "close." *Post*, at 21. Since his opinion fairly identifies the countervailing factors, I need only state that the interest in allowing the Government to proceed cautiously and deliberately before making a final decision to prosecute for such a serious offense is of decisive importance for me in this case. I therefore concur in the Court's judgment.

Justice Department; the Army's initial 13-volume report was not submitted to the Justice Department until June 1972, and supplemental reports were filed as late as August 1973. Within a year, the Justice Department completed its review of the massive evidence thus accumulated and submitted the evidence to a grand jury. The grand jury returned the indictment five months later.

Plainly the indictment of an accused—perhaps even more so the indictment of a physician—for the heinous and brutal murder of his pregnant wife and two small children is not a matter to be hastily arrived at either by the prosecution authorities or by a grand jury. The devastating consequences to an accused person from the very fact of such an indictment is a matter which responsible prosecutors must weigh carefully. The care obviously given the matter by the Justice Department is certainly not any indication of bad faith or deliberate delay.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

On February 17, 1970, in the early morning, Dr. Jeffrey R. MacDonald called military police and requested help. When police arrived at the family quarters, they found him unconscious and suffering from multiple stab wounds, including one that threatened his life. His wife and two young children had been murdered. On May 1, 1970, the Army formally charged him with the murders. The Army dropped those charges on October 23, 1970, but reopened the investigation at the request of the Justice Department and handed over a comprehensive report in June 1972. The Justice Department did not convene a grand jury until August 1974, more than two years later. The Court of Appeals charged this delay to Government "indifference, negligence, or ineptitude." *United States* v. *MacDonald*, 531 F. 2d 196, 207 (CA4 1976) *(MacDonald I)*. On January 24, 1975, MacDonald was indicted by a civilian grand jury on three counts of murder, the same charges that the military authorities had dropped. Trial commenced in the summer of 1979.

Confronted with these facts, the majority reaches the facile conclusion that the speedy trial right is not implicated at all when the same sovereign initiates, drops, and then reinitiates criminal charges. That conclusion is not justified by the language of the Speedy Trial Clause or the teachings of our cases, and it is hopelessly at odds with any sensible understanding of speedy trial policies. I must dissent.

## I

Because the majority scants the relevant facts in this case, I review them in somewhat more detail. The initial investigation of the murders in this case was conducted by the Army's Criminal Investigation Division (CID) and the Federal Bureau of Investigation, as well as the local police. On May 1, 1970, the Army formally charged MacDonald with three specifications of murder, in violation of Article 118 of

the Uniform Code of Military Justice, 10 U. S. C. § 918. The Army conducted a lengthy hearing during which 56 witnesses testified. MacDonald himself testified and was extensively cross-examined. At the conclusion of the hearing, the investigating officer filed an exhaustive report recommending that the charges against MacDonald be dismissed "because the matters set forth in all charges and specifications are not true." See *MacDonald I, supra,* at 200. He also recommended that the civilian authorities investigate Helena Stoeckley, who had told several persons that she was involved in the crime. On October 23, 1970, the Commanding General of MacDonald's unit accepted the recommendation and dismissed the charges. In December, MacDonald received an honorable discharge.

The prosecution did not, however, terminate on that date. Within a month of MacDonald's discharge, at the specific request of the Justice Department, the CID continued its investigation. The renewed investigation was extensive and wide-ranging. The CID conducted 699 interviews and, at the request of the Department, sent the weapons and the victims' clothing to the FBI laboratory in July 1971. In December 1971, the CID completed its investigation, and in June 1972, the CID submitted a 13-volume report to the Justice Department. Although supplemental reports were transmitted in November 1972 and August 1973, the Court of Appeals found that "no significant new investigation was undertaken during this period, and none was pursued from August 1973 until the grand jury was convened a year later." *MacDonald I, supra,* at 206. Indeed, the United States Attorney for the Eastern District of North Carolina recommended that the matter be submitted to a grand jury within six months of June 1972, and in 1973, the CID suggested the convening of a grand jury before it conducted further investigation.

MacDonald was fully aware of these investigations. After his honorable discharge, MacDonald moved to California and resumed the practice of medicine. In 1971, the CID again in-

terviewed him.   From January 1972 to January 1974, he re-
peatedly requested the Government to complete its investi-
gation, and offered to submit to further interviews.   The
Justice Department declined to question him or to advise him
when the investigation would terminate.   In January 1974,
the Department wrote that "this case is under active investi-
gation and will remain under consideration for the foresee-
able future."   *MacDonald I, supra,* at 201, n. 6.   There was
no further correspondence.

The Government did not present the case to a civilian
grand jury until August 1974.   MacDonald waived his right
to remain silent and testified before the grand jury for a total
of more than five days.   Numerous other witnesses testified,
the bodies of the victims were exhumed, and the FBI re-
investigated certain aspects of the crime.   An indictment
was returned on January 24, 1975.   The indictment charged
MacDonald with three counts of first-degree murder.

The Government offered no legitimate reason—not even
docket congestion—for the delay between the submission of
the June 1972 report and the presentation to the grand jury
in August 1974.   The Court of Appeals explained:

> "The leisurely pace from June 1972 until the indictment
> was returned in January 1975 appears to have been pri-
> marily for the government's convenience.   The Assist-
> ant United States Attorney for the Eastern District of
> North Carolina, who is familiar with the case, expressed
> an even harsher assessment of the delay.   He told the
> magistrate at the bail hearing that the tangible evidence
> had been known to the government since the initial in-
> vestigation in 1970 but that it had not been fully analyzed
> by the F.B.I. until the latter part of 1974.   He explained
> that the F.B.I. analysis was tardy 'because of govern-
> ment bureaucracy.'"   *MacDonald I, supra,* at 206 (foot-
> notes omitted).

The FBI's failure to complete its analysis until 1974 is the
only Government justification for the delay that the District

Court mentioned in its initial decision denying MacDonald's motion to dismiss on speedy trial grounds. 1 App. for Appellant in No. 79–5253 (CA4), p. 46. In its post-trial decision, the District Court again denied the motion, but stated its belief that "the case could have been put before the grand jury at a much earlier date than it was." 485 F. Supp. 1087, 1089 (EDNC 1979).

## II

The majority's analysis is simple: the Speedy Trial Clause offers absolutely no protection to a criminal defendant during the period that a charge is not technically pending. But simplicity has its price. The price, in this case, is disrespect for the language of the Clause, important precedents of this Court, and speedy trial policies.

"In all criminal prosecutions," the Sixth Amendment recites, "the accused shall enjoy the right to a speedy and public trial." On its face, the Sixth Amendment would seem to apply to one who has been publicly accused, has obtained dismissal of those charges, and has then been charged once again with the *same* crime by the *same* sovereign. Nothing in the language suggests that a defendant must be continuously under indictment in order to obtain the benefits of the speedy trial right. Rather, a natural reading of the language is that the Speedy Trial Clause continues to protect one who has been accused of a crime until the government has completed its attempts to try him for that crime.

Our cases, to the extent they address the issue, contradict the majority's view. In *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967), the prosecutor entered a *"nolle prosequi* with leave" after the first trial ended in a mistrial. Under that procedure, the defendant was discharged from custody and subject to no obligation to report to the court, but the prosecutor could reinstate the indictment at any time upon application to the court. This Court held that the indefinite postponement of the prosecution, over the defendant's objection, "clearly" denied the defendant the right to a speedy

trial. *Id.*, at 222. The Court reasoned that the defendant "may be denied an opportunity to exonerate himself in the discretion of the solicitor and held subject to trial, over his objection, throughout the unlimited period in which the solicitor may restore the case to the calendar. During that period, there is no means by which he can obtain a dismissal or have the case restored to the calendar for trial." *Id.*, at 216. In that case, of course, the indictment technically had not been dismissed when the defendant was discharged from custody. However, the prosecutor was required to take affirmative steps to reinstate the prosecution; no charges were actively pending against Klopfer. The Court nevertheless held that the speedy trial right applied.

*Klopfer* teaches that the anxiety suffered by an accused person, even after the initial prosecution has terminated and after he has been discharged from custody, warrants application of the speedy trial protection. The analysis in *United States* v. *Marion*, 404 U. S. 307 (1971), relied on by the majority, is entirely consistent with this teaching. The Court in *Marion* held that the Speedy Trial Clause does not apply to the period before a defendant is first indicted, arrested, or otherwise officially accused. However, the Court hardly suggested that after the first official accusation has been made, the dropping of charges prior to a *second* official accusation wipes the slate clean.

The Court explained its holding by stating that "the indictment was the *first official act* designating appellees as accused individuals." *Id.*, at 324 (emphasis added). Sixth Amendment provisions "would seem to afford no protection to those *not yet accused,* nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time." *Id.*, at 313 (emphasis added). Prior to the time of arrest or indictment, an accused may suffer anxiety, but he does not suffer the special form of anxiety engendered by public accusation. "Arrest is a public act that may seriously interfere with the defendant's liberty,

whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Id.*, at 320. The Court did not address the question whether, after a public accusation has been made but charges have technically been dropped, the defendant is in precisely the same constitutional situation as if no accusation had ever been made.

*Marion* also adverts to a serious procedural impediment to extending the speedy trial right prior to a first arrest or indictment: inquiry into when the police could have made an arrest or when the prosecutor could have brought charges would raise difficult problems of proof. *Id.*, at 321, n. 13; see *id.*, at 313. But in a case of successive prosecutions on the same charge, these difficulties do not exist: the speedy trial right should attach from the date of the initial accusation, a date which is simple to determine.[1] In short, the majority's decision to suspend application of the speedy trial right is not required by, and may be inconsistent with, our prior cases.[2]

The majority also plainly ignores fundamental speedy trial policies. The special anxiety that a defendant suffers because of a public accusation does not disappear simply because the initial charges are temporarily dismissed. Especially when the defendant and the public are aware of an ongoing government investigation of the same charges, the defendant's interest in final resolution of the charges remains acute. After all, the government has revealed the seriousness of its threat of prosecution by initially bringing charges. The majority thus paints an entirely unrealistic portrait when

---

[1] *Marion* also notes that the statute of limitations will serve as protection in cases of pre-indictment delay. But no such protection exists here, since there is no statute of limitations for murder.

[2] Contrary to the majority's suggestion, most of the Courts of Appeals considering the issue have concluded that the period after dismissal of initial charges *is* included for speedy trial purposes. The First, Fifth, Seventh, and Tenth Circuits have all reached this conclusion. See *United*

it suggests that such a defendant "is, at most, in the same position as any other subject of a criminal investigation." *Ante*, at 8–9.

MacDonald was painfully aware of the ongoing Army and Justice Department investigations. He was interviewed again by military authorities soon after his honorable discharge. He repeatedly inquired about the progress of the investigations. He even proposed to submit to further interviews in order to speed final resolution of his case. MacDonald "realized that the favorable conclusion of the [military] proceedings was not the end of the government's efforts to convict him. Prudence obliged him to retain attorneys at his

---

*States* v. *Cabral*, 475 F. 2d 715 (CA1 1973); *United States* v. *Nixon*, 634 F. 2d 306, 308–309 (CA5), cert. denied, 454 U. S. 828 (1981); *United States* v. *Avalos*, 541 F. 2d 1100, 1108, n. 13 (CA5 1976); *United States* v. *McKim*, 509 F. 2d 769, 773 (CA5 1975); *Jones* v. *Morris*, 590 F. 2d 684 (CA7) *(per curiam)*, cert. denied, 440 U. S. 965 (1979); *United States* v. *DeTienne*, 468 F. 2d 151, 155 (CA7 1972), cert. denied, 410 U. S. 911 (1973); *United States* v. *Merrick*, 464 F. 2d 1087, 1090 (CA10), cert. denied, 409 U. S. 1023 (1972). See also *United States* v. *Small*, 345 F. Supp. 1246, 1248–1250 (ED Pa. 1972) (holding that right attaches from initial military arrest through civilian trial, although in fact civilian indictment immediately followed dismissal of military charges). But see *United States* v. *Davis*, 487 F. 2d 112, 116 (CA5 1973), cert. denied, 415 U. S. 981 (1974).

Even the Circuits whose opinions the majority cites as support have issued somewhat contradictory signals on this question. See *United States* v. *Lai Ming Tanu*, 589 F. 2d 82, 88–89 (CA2 1978) (leaving open question whether speedy trial right may ever apply continuously to successive state and federal prosecutions for the same transaction); *United States* v. *Roberts*, 548 F. 2d 665 (CA6), cert. denied *sub nom. Williams* v. *United States*, 431 U. S. 920 (1977) (considering time between dismissal and indictment for speedy trial purposes without discussing contrary opinion in *United States* v. *Martin*, 543 F. 2d 577 (CA6 1976), cert. denied, 429 U. S. 1050 (1977)); *United States* v. *Henry*, 615 F. 2d 1223, 1233, n. 13 (CA9 1980) (leaving question open, and limiting *Arnold* v. *McCarthy*, 566 F. 2d 1377 (CA9 1978), to the case of a dismissal following a mistrial); *United States* v. *Lara*, 172 U. S. App. D. C. 60, 63–65, 520 F. 2d 460, 463–465 (1975) (considering tactical Government delay between dismissal and indictment for speedy trial purposes).

own expense for his continuing defense. He remained under suspicion and was subjected to the anxiety of the threat of another prosecution." *MacDonald I*, 531 F. 2d, at 204 (footnote omitted). It is simply absurd to suggest that he has suffered no greater anxiety, disruption of employment, financial strain, or public obloquy than if the military charges had never been brought.

The majority's insistence that the dismissal of an indictment eliminates speedy trial protections is not only inconsistent with the language and policies of the Speedy Trial Clause and with this Court's decisions. It is also senseless. Any legitimate government reason for delay during the period between prosecutions can, indeed must, be weighed when a court determines whether the defendant's speedy trial right has been violated. No purpose is served by simply ignoring that period for speedy trial purposes.[3] In *Barker* v. *Wingo*, 407 U. S. 514 (1972), this Court rejected an inflexible approach to the right to a speedy trial in favor of "a difficult and sensitive balancing process." *Id.*, at 533 (footnote omitted). Lower court opinions indicate that this responsibility can be faithfully discharged in the special circumstances of successive prosecutions.[4]

---

[3] The Government argues that considering the time between dismissal and reinstitution of charges for speedy trial purposes will have untoward consequences: it will discourage prosecutors from dismissing charges that were obtained improperly or prematurely, or that appear unwarranted in light of new evidence, and it will dissuade prosecutors from reopening dismissed charges in light of changed circumstances. The argument is specious, since a court will consider the Government's reasons for delay in ruling on the speedy trial issue. If the Government has dismissed charges in good faith and reopens the case based on material new evidence, then the delay should not count against the Government. In this case, the Court of Appeals sensitively evaluated the Government's reasons for delay and only counted a portion of that time against the Government. See n. 7, *infra*.

[4] See, *e. g.*, *United States* v. *Henry, supra* (assuming that time between indictments is considered in speedy trial calculus but finding no violation, where part of one-year delay was due to renewed investigation, part was due to negligence, and prejudice was not shown); *United States* v. *Roberts*,

It is no answer that the Due Process Clause protects against purposeful or tactical delay that causes the accused actual prejudice at trial.  The due process constraint is limited, and does not protect against delay which is not for a tactical reason but which serves no legitimate prosecutorial purpose.[5]  See *United States* v. *Lovasco*, 431 U. S. 783 (1977). According only limited protection is appropriate prior to the first arrest or indictment because the state has a substantial interest in conducting a relatively unrestricted pre-accusation investigation, see *id.*, at 790–795, and because a person not yet accused has a lesser interest in a speedy prosecution. But when a government has already investigated and accused a defendant, it is in a much better position, and properly shoulders a greater responsibility, to reinvestigate and reprosecute the defendant with reasonable promptness. Moreover, as explained above, delay between public accusation, dismissal of charges, and renewed indictment causes peculiar anxiety to the accused, as well as the other consequences of arrest described in *Marion*.  Thus, the government must affirmatively demonstrate a legitimate reason, other than neglect or indifference, for such a delay.

---

*supra* (considering time between dismissal of initial charges and return of indictment but finding no violation, where two of codefendants were involved in other court proceedings, evidence was complex, witnesses changed their stories, prosecution needed to judge whether to use confidential informants, and defendant showed no actual prejudice); *Jones* v. *Morris, supra* (considering time between dismissal of first indictment and reinstitution of proceedings but finding no violation, where defendant did not assert speedy trial right until after second indictment was brought, on the eve of trial; where delay, although unexplained, was not in bad faith; and where defendant proved no special anxiety or actual prejudice); *United States* v. *McKim, supra* (considering time between first indictment and trial on *third* indictment but finding no violation, where delay was only one year and defendant did not prove actual prejudice).

[5] Whether the delay in this case falls within that category is unclear. The Court of Appeals did not reach the due process issue, and this Court therefore properly leaves it open on remand.

The majority's approach denigrates speedy trial policies and presents a serious potential for abuse. Under that approach, the government could indefinitely delay a second prosecution for no reason, or even in bad faith,[6] if the defendant is unable to show actual prejudice at trial. The Court of Appeals in this very case suggested that the Government may have proceeded on the assumption that pre-indictment delay would be of no speedy trial consequence. *MacDonald I, supra,* at 206, n. 17. I fear that, as a consequence of today's decision, unreasonable and unjustifiable delay between prosecutions may become commonplace.

## III

I conclude that application of the speedy trial right was not suspended during the period between the Army's dismissal of murder charges against MacDonald in October 1970 and the return of a civilian indictment on the same charges in January 1975. The question remains whether the delay violated his speedy trial right. I find the question close. However, after examining the four speedy trial right factors enunciated in *Barker* v. *Wingo, supra*—length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant—I agree with the Court of Appeals that MacDonald's speedy trial rights were violated.

The proper focus for this analysis is the 26-month period between June 1972 and the convening of a grand jury in August 1974.[7] Neither the District Court nor the Court of Ap-

---

[6] The majority's statement that the delay in this case was not in bad faith, *ante,* at 10–11, n. 12, is puzzling. Under the majority's constricted view of the Sixth Amendment, the good or bad faith of the government in the period between successive prosecutions is entirely irrelevant to whether the defendant's speedy trial right has been violated, since the defendant is not continually under formal accusation during that period.

[7] Although the total period of delay between initial prosecution and trial is more than nine years, the period prior to dismissal of military charges is not chargeable to the Government because those charges were promptly resolved. The Court of Appeals properly also gave little weight to the pe-

peals found any legitimate reason for this delay. As the Court of Appeals' second panel concluded: "The primary reason for the two-year delay was either a disagreement between two groups in the Justice Department as to whether the case should be prosecuted, or just simple government bureaucracy (the contention of the involved Assistant U. S. Attorney)." 632 F. 2d 258, 262 (CA4 1980) *(MacDonald II)*. Although the FBI did conduct further tests and investigation after the grand jury was convened, the Government has not demonstrated that it could not have pursued those leads earlier.

MacDonald undeniably asserted his right to a speedy trial vigorously and often, beginning in January 1972. Although the Government's delay in pressing formal civilian charges prevented MacDonald from filing a formal motion to dismiss on speedy trial grounds, he invoked his right in the only meaningful way open to him. Indeed, the strength of his efforts is a powerful indication that he has suffered serious personal prejudice. See *Barker* v. *Wingo,* 407 U. S., at 531.

The last speedy trial factor, and the most difficult to evaluate on this record, is prejudice to the accused. Proof of actual prejudice to the defense at trial is not, of course, necessary to demonstrate a speedy trial violation. *Moore* v. *Arizona,* 414 U. S. 25 (1973) *(per curiam).* In *Moore,* this Court held that a defendant's speedy trial claim should not have been dismissed without further hearing, where the defendant was tried three years after he was first charged and 28 months after he demanded a speedy trial. In this case, the period of unjustified delay is at least two years, and MacDonald demanded an early disposition prior to that period. Because of this delay, a speedy trial violation could be found in this case, even without proof of actual prejudice at trial.

---

riod between the CID's initial reinvestigation and the submission of its report to the Justice Department in June 1972, since the prior dismissal for insufficient evidence warranted a more extensive investigation. The period subsequent to the civilian indictment was mainly consumed by judicial proceedings to evaluate MacDonald's speedy trial claims.

The record is clear that the delay caused MacDonald to suffer other forms of substantial prejudice, including continuing anxiety, intrusive publicity, legal expense, and disruption of a new civilian career.

The proof of actual prejudice at trial in this case, although somewhat speculative, does buttress MacDonald's speedy trial claim. It is possible that Stoeckley's trial testimony would have been less confused and more helpful to MacDonald at an earlier date. This testimony was critical to MacDonald, whose principal defense was that she was one of a group of intruders who committed the murders. Although Stoeckley was hardly a reliable witness, she did testify at trial that she had no memory of the events that night, in contradiction to some of her earlier out-of-court statements. See *MacDonald II*, 632 F. 2d, at 264–265. Her claim of loss of memory obviously became more credible with the passage of time. It is likewise possible that the inevitable "coaching" of Government witnesses prior to their testimony would have had lesser adverse impact on the defense, and could have been minimized more effectively by cross-examination, had the trial occurred earlier.[8] See *id.*, at 263–264. The unusual facts of this case, recited by the majority, suggest that slight differences in trial testimony may well have influenced the verdict.[9]

Balancing these factors, I conclude that the Court of Appeals was correct in finding a speedy trial right violation. The Government undoubtedly has an interest in renewing the investigation of a charge that has been dismissed, in evaluat-

---

[8] For example, a babysitter who had testified in 1970 that she had not seen an ice pick in MacDonald's home had changed her story by the time of trial. Cross-examination by the defense did not cause her to reaffirm her earlier story. Tr. 3559–3560, 3567–3572.

[9] I therefore disagree with the majority that the speedy trial analysis should not be influenced by the evidentiary basis for the jury verdict. *Ante*, at 6, n. 6. Moreover it is obvious that respondent "does not challenge the jury verdict itself," *ibid.*, only because that issue is not directly presented on this petition.

ing carefully whether a second prosecution should be brought, and in avoiding undue haste, especially when the charge is murder. By the same token, when such a serious charge has already been brought, and when the defendant is suffering the consequences of that public charge and of a renewed investigation, the Government must not delay its decision for reasons of indifference or neglect. The Government's interest in reaching an informed decision whether to prosecute is certainly legitimate; but vague, unexplained references to internal disagreement about prosecution cannot justify more than two years of indecision. Because the record in this case reveals no legitimate reason for a substantial period of pretrial delay, and because MacDonald may have suffered prejudice at trial and clearly suffered other forms of prejudice, I would affirm the Court of Appeals' ruling that his speedy trial right was violated.

## IV

The majority's opinion in this case is a disappointing exercise in strained logic and judicial illusion. Suspending application of the speedy trial right in the period between successive prosecutions ignores the real impact of the initial charge on a criminal defendant and serves absolutely no governmental interest. This Court has warned before against "allowing doctrinaire concepts . . . to submerge the practical demands of the constitutional right to a speedy trial." *Smith* v. *Hooey*, 393 U. S. 374, 381 (1969). The majority fails to heed that advice.

For the foregoing reasons, I dissent.