**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0110n.06

**No. 16-1009**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 16, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JIMMIE EUGENE WHITE, II, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: GUY, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In this direct criminal appeal, defendant Jimmie White, II, appeals his convictions for drug distribution and firearms crimes. He alleges violations of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*., and the Sixth Amendment's Speedy Trial Clause. White also maintains the district court erred in failing to suppress the tracking information for his cell phone, and challenges the sufficiency of the evidence in support of his firearms convictions. We affirm the district court's judgment.

I.

After a months-long investigation into ecstasy trafficking in Detroit, Drug Enforcement Agency ("DEA") agents executed a search warrant at White's home on May 14, 2010. From a locked safe, they recovered over $25,000 in cash, 898 N–Benzylpiperazine Dihydrochloride

("BZP") pills, an unloaded Cobray 9 mm handgun with an obliterated serial number, and an extended magazine loaded with twenty-five rounds of ammunition for the handgun. The safe was divided into two immediately-accessible compartments with the gun and ammunition on one side, and the pills and cash on the other.

The investigation precipitating the search involved several investigation techniques, including a Title III wiretap interception of White's cell phone conversations, and state-issued search warrants to track the location of his cell phone. The Title III wiretap authorized agents to monitor White's calls from early February to early March 2010. During that time, the agents recorded White arranging a series of drug deals. For example, on February 17, 2010, White spoke with an unidentified male calling to "see what the play is," and then requesting "a nickel" of "the fine." White called back the next day, saying he had pills imprinted with airplanes. The client said he wanted "the chalky ones" and "some hitters" because he "d[id]n't want no more complaints[.]" White advised that the "airplanes" and "transformers" were a "good combo," and the two arranged to meet that Saturday.

The agents also obtained search warrants to track the location of White's cell phone.[1] A DEA agent signed the affidavit presented in support of the May 28, 2009, warrant request. A Dearborn Heights, Michigan police officer assigned to the DEA as a task force officer signed the affidavit presented in support of the February 5, 2010, warrant request. To justify the request, the affiants each swore that:

> [I]n order to determine where the cellular phone is being used, it is necessary that
> the above stated records be furnished to your Affiant on a continuous basis until

---

[1]White claims three such warrants were issued for his cell phone: on May 28, 2009, February 5, 2010, and April 10, 2010. Only the May and February warrants are available in the record, however. Because White makes no argument particular to the April 10, 2010, warrant, we limit our discussion to the May and February warrants, as did the district court.

the account is closed, or until known are [White's] drug trafficking activities, his residence, his vehicles and his narcotics distribution associates.

A state magistrate judge issued these warrants for 30 days for the searching of

[a]ny and all records relating to the location of cellular phone tower(s) including specific active GPS precision tracking of cellular phone number (313) 674-6225. Said records shall include the time period from [date], on a continuous basis until [date].

Based primarily on information obtained through calls intercepted under the Title III wiretap and physical surveillance, a magistrate judge issued a warrant to search White's home. When the search began, White's mother and brother were home. White was also home, asleep in the master bedroom with a female acquaintance. After White emerged from his bedroom undressed, the agents allowed him to return to get some clothing. In addition to White's clothes, the master bedroom contained many other personal items, including his bank statements, debit card, passport, social security card, two driver's licenses, and cell phone. The safe was also in White's bedroom, but the agents had to take it outside and pry it open because neither White nor anyone else in the home would surrender a key or divulge the combination.

While the search was ongoing, DEA agents arrested White and took him to their Detroit office to interview him. The arrest form states White was arrested for "probable cause" and on an outstanding Ohio warrant. White waived his *Miranda* rights at the DEA office and spoke with the agents. He admitted selling ecstasy for about one year and estimated that he had sold around 10,000 pills. He also admitted the safe was his, and volunteered that it contained about 900 pills and around $25,000 in cash. White denied knowing about the gun, however, and speculated that someone must have put it in the safe during a party he hosted the previous weekend.

The government did not formally charge White at that time, in part because he promised to cooperate with the DEA. Instead, White was released into state custody and held at the Wayne County jail on the Ohio warrant until he was extradited to Ohio to face state charges pending against him there. He was sentenced in Ohio on October 12, 2010, to time served and released.

On April 29, 2013, the government filed a complaint against White charging him with drug distribution and firearm crimes related to the May 14, 2010, search and seizure. White was arrested on those charges, and an order of temporary detention was entered, on May 2, 2013. He made his initial appearance the next day and was released on bond.

After his arrest, the parties engaged in pre-indictment plea negotiations. To that end, they filed a stipulation with the district court on May 17, 2013, agreeing to adjourn White's preliminary hearing and exclude the time between May 23, 2013, and June 7, 2013, from White's Speedy Trial Act clock. Plea negotiations were not successful, and a grand jury indicted White on June 4, 2013, on the following four counts:

Count I: conspiracy to distribute BZP and ecstasy or MDMA, 21 U.S.C. § 846;

Count II: possession of BZP with intent to distribute, 21 U.S.C. § 841(a)(1);

Count III: possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A); and

Count IV: possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1).

White was arraigned on June 12, 2013.

As his case progressed, White filed more than twenty motions, both pro se and through counsel. Among them was his motion through counsel to dismiss the indictment for violations of the Speedy Trial Act and the Sixth Amendment's Speedy Trial Clause, and his pro se motion to

suppress the tracking information derived from the warrants issued for his cell phone. The district court held a hearing on each and denied both.

The district court held a three-day trial. White stipulated to having a prior felony conviction. The government played several of White's cell phone calls for the jury. The government also relied on evidence of the contents of the safe and White's bedroom. Ultimately, a jury convicted White on all counts. The district court sentenced White to 84 months in prison: 24 months on Counts 1, 2, and 4, to run concurrently, and the mandatory minimum of 60 months on Count 3, to run consecutively. White timely appeals.

II.

On appeal, White contests the denial of his motion to dismiss the indictment for speedy trial violations and his motion to suppress evidence derived from the cell phone tracking warrants. In addition, he argues there was insufficient evidence to sustain his firearms convictions. We begin with his speedy trial challenges.

A.

First, White argues the government violated the Speedy Trial Act by failing to file an indictment against him within thirty days of his 2013 arrest. The government contends no violation occurred because the parties stipulated to exclude two weeks of pre-indictment plea negotiations under § 3161(h)(1). We agree with the government.

"We review *de novo* the district court's interpretation of the Speedy Trial Act and its factual findings for clear error." *United States v. Anderson*, 695 F.3d 390, 396 (6th Cir. 2012). The Speedy Trial Act obligates the government to file an indictment against a defendant within thirty days of his arrest. *See* 18 U.S.C. § 3161(b). Section 3161(h) specifies which types of delay are excludable. *See* § 3161(h). A delay under § 3161(h)(7) is excludable if the district

court makes case-specific findings. "As relevant here, subsection (h)(1) requires the automatic exclusion of '[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to' periods of delay resulting from eight enumerated subcategories of proceedings." *Bloate v. United States*, 559 U.S. 196, 203 (2010) (quoting § 3161(h)(1) (footnote omitted)). These delays "may be excluded without district court findings." *Id.*

White was arrested on May 2, 2013, and indicted on June 4, 2013. The parties filed a stipulation with the district court on May 17, 2013, agreeing to exclude the time between May 23, 2013, and June 7, 2013, from White's Speedy Trial Act clock. In their stipulation, the parties agreed to exclude the two-week period under § 3161(h)(1), and also under § 3161(h)(7) because "the ends of justice . . . outweigh the interests of the public and the defendant in a speedy trial." The stipulation further stated that White "concurs in this request and agrees that it is in his best interest."

The magistrate judge found "that good cause exists to extend the complaint and preliminary hearing" to June 7, 2013, and ordered that the two-week period "be excluded in calculating the time within which the defendant shall be indicted under the Speedy Trial Act." He attached the parties' stipulation to his order. The district court judge upheld the order because it was premised "in some measure on a stipulation," but also on "a finding by a judicial officer that the time was appropriately excluded based upon the fact that the parties were engaged in plea negotiations."

White does not contest the district court's finding that the parties were engaged in plea negotiations during the period in question. Nor does he offer any evidence indicating that he did not "concur[] in this request [or] agree[] that it is in his best interest[.]" Instead, he argues the order is invalid because the magistrate judge did not make any of the findings required for an

ends-of-justice continuance under § 3161(h)(7). This argument, however, conflates the ends-of-justice requirements with the automatically-excludable periods of delay under § 3161(h)(1).

In this Circuit, plea negotiations are "period[s] of delay resulting from other proceedings concerning the defendant" automatically excludable under § 3161(h)(1). *See United States v. Dunbar*, 357 F.3d 582, 593 (6th Cir. 2004) ("We have held that plea negotiations may be excluded as 'other proceedings' pursuant to § 3161(h)(1)."), vacated and remanded on other grounds by *Dunbar v. United States*, 543 U.S. 1099 (2005); *United States v. Bowers*, 834 F.2d 607, 609–10 (6th Cir. 1987) (per curiam) (" . . . the plea bargaining process can qualify as one of many 'other proceedings.'"). Although the plea bargaining process is not expressly specified in § 3161(h)(1), the listed proceedings "are only examples of delay 'resulting from other proceedings concerning the defendant' and are not intended to be exclusive." *Bowers*, 834 F.2d at 610.

White's indictment was delayed because he engaged, through counsel, in plea negotiations for a pre-determined amount of time. This two-week period may be excluded without making separate findings as required for an ends-of-justice continuance. *See Dunbar*, 357 F.3d at 593, 597 n.7. White concedes the point. The district court thus did not clearly err in finding that the parties had engaged in two weeks of pre-indictment plea negotiations and properly concluded that these negotiations were excludable from the Speedy Trial Act calculation.

## B.

Second, White contends that the three-year delay between his May 2010 arrest and his September 2013 motion to dismiss violated the Sixth Amendment's Speedy Trial Clause. The

district court found no violation because the Speedy Trial Clause did not apply until White's May 2013 arrest and detention on a criminal complaint. We agree with the district court.

In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, this court reviews questions of law de novo and questions of fact for clear error. *United States v. Young*, 657 F.3d 408, 413–14 (6th Cir. 2011). The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court established four factors for evaluating a speedy-trial claim: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. *Id.* at 530. "The first factor is a threshold requirement, and if the delay is not uncommonly long, judicial examination ceases. A delay approaching one year is presumptively prejudicial." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006) (citation omitted).

White argues the delay in this case was over three years long, but he is calculating from the wrong date of arrest. Arrest can trigger an accused's Sixth Amendment speedy trial rights. *See United States v. MacDonald*, 456 U.S. 1, 6 (1982). But "when no indictment is outstanding, only the '*actual* restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections of the speedy trial provision of the Sixth Amendment.'" *United States v. Loud Hawk*, 474 U.S. 302, 310 (1986) (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)); *cf. Rashad v. Walsh*, 300 F.3d 27, 36 (1st Cir. 2002) ("Although arrest may trigger the right to a speedy trial, it does not do so unless the arrest is the start of a continuous restraint on the defendant's liberty, imposed in connection with the same charge on which he is eventually put to trial."). This is because the Speedy Trial Clause reflects "the concern that a presumptively

innocent person should not languish under an unresolved charge[.]"[2] *Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016).

White did not languish for three years under unresolved charges in this case. Although DEA agents arrested White on May 14, 2010, they released him into state custody that same day on an outstanding Ohio warrant rather than charge him with federal crimes. Thus, White was not "arrested and held to answer criminal charges" in relation to this case until his May 2013 arrest on a criminal complaint filed days before. *See United States v. Gouveia*, 467 U.S. 180, 185–86 (1984) ("[T]he Sixth Amendment speedy trial right is triggered when an individual is arrested and held to answer criminal charges."). And without outstanding federal charges, White was, "at most, in the same position as any other subject of a criminal investigation." *See MacDonald*, 456 U.S. at 8–9. Therefore, until his arrest on such charges, White's "situation [did] not compare with that of a defendant who ha[d] been arrested *and* held to answer." *See id.* at 9 (emphasis added) (quoting *Marion*, 404 U.S. at 321).

In short, White cannot satisfy the threshold *Baker* factor. The delay between White's 2013 arrest and his motion to dismiss was approximately five months. White does not explain how this five-month delay was presumptively or actually prejudicial. Although it is unclear why the government waited three years to charge and arrest White in this matter, the Speedy Trial Clause does not "limit the length of a preindictment criminal investigation even though 'the [suspect's] knowledge of an ongoing criminal investigation will cause stress, discomfort, and

---

[2]The right to a speedy trial is "not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations." *MacDonald*, 456 U.S. at 8. White's prosecution satisfied the applicable five-year statute of limitations. *See* 18 U.S.C. § 3282(a). And while the Fifth Amendment's Due Process Clause provides limited protection against "oppressive" pre-arrest or pre-indictment delay, *United States v. Lovasco*, 431 U.S. 783, 789 (1977), White does not raise a due process argument in the alternative on appeal.

perhaps a certain disruption in normal life.'" *Loud Hawk*, 474 U.S. at 312 (quoting *MacDonald*, 456 U.S. at 9). Nor would anyone's interests "be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *Lovasco*, 431 U.S. at 792 (footnote omitted). The district court thus did not err in concluding that the Speedy Trial Clause was not implicated until White's May 2013 arrest, and the five-month delay between this arrest and his motion to dismiss was not presumptively prejudicial.

C.

White also challenges the district court's denial of his motion to suppress evidence derived from tracking his cell phone. When reviewing the district court's ruling on a motion to suppress, this court reviews findings of fact for clear error and legal conclusions de novo. *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007). "When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003).

In denying White relief, the district court held that, although the tracking warrants did not satisfy the Fourth Amendment's particularity requirement, the *Leon* good-faith exception to the exclusionary rule saved the evidence. White argues the district court erred because a reasonable officer would have recognized the warrants as invalid. We need not reach this argument, however, because White cannot show he was prejudiced by the district court's failure to suppress in the first instance.

Simply put, White does not point to any tracking evidence introduced against him at trial. And while the application in support of the warrant to search White's residence included some cell phone tracking information, it only referenced the locations of phones other than White's. White does not contest the district court's legal conclusion that he does not have a reasonable

expectation of privacy in cell phones other than his own and therefore cannot challenge the seizure of that data. Moreover, White's theory that the tracking evidence for his phone might have tainted the Title III wiretap warrant is merely speculative. Since he did not challenge the validity of this warrant in district court, the record is devoid of relevant evidence, such as the warrant itself. And, in any case, White does not even assert plain error, let alone establish it.

Where resulting evidence has not affected a defendant's trial, any error would be harmless, and this court has declined to grant relief. *See, e.g.*, *United States v. Charles*, 138 F.3d 257, 264–65 (6th Cir. 1998) (failure to suppress cell phone did not harm defendant because government never introduced it at trial); *see also United States v. Davis*, 531 F. App'x 601, 605 (6th Cir. 2013) (suppression challenge moot because defendant's statement was not admitted at trial). Indeed, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). Since this is the only premise for exclusion White submits, his suppression challenge fails.

### D.

Finally, White argues the evidence presented at trial was insufficient for conviction on either firearm possession charge. We review these claims de novo, assessing the evidence "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015). "This standard applies even if the evidence is purely circumstantial. Consequently, in raising a sufficiency of the evidence claim, a defendant 'bears a very heavy burden.'" *United States v. Geisin*, 612 F.3d 471, 489 (6th Cir. 2010) (citation omitted) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

To sustain a conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), the government must prove the defendant had previously been convicted of a felony, and he knowingly possessed a firearm that had traveled in interstate commerce. *United States v. Morrison*, 594 F.3d 543, 544 (6th Cir. 2010).

White challenges the sufficiency of the evidence regarding possession only. The government advanced its case against defendant based on a theory of constructive possession, which exists "when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977). Constructive possession may be proven by direct or circumstantial evidence, and "[i]t is not necessary that such evidence remove every reasonable hypothesis except that of guilt." *Id*. "Proof that 'the person has dominion over the premises where the firearm is located' is sufficient to establish constructive possession." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (quoting *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993) (per curiam)).

Even if White did not have exclusive possession of the entire home, the government presented credible evidence at trial that he had "dominion" over the master bedroom where the gun was found. When the search began, White emerged from the master bedroom where he had been sleeping. That is where he kept his clothes. Also in that bedroom were his bank statements, debit card, passport, social security card, driver's licenses, and cell phone. As there was no evidence of anyone else's personal possessions in the master bedroom, a rational juror could infer that White alone controlled that space. *See United States v. Lewis*, No. 15–2386, 2016 WL 5922615, at *2 (6th Cir. Oct. 12, 2016) (finding constructive possession where a gun

was found in a bedroom containing men's clothing, mail addressed to defendant, his birth certificate, his resume, and other papers).

White's safe was also in the bedroom, in a closet. The safe was locked, further limiting access to its contents. But White must have known the combination, even if he would not volunteer it to law enforcement, because that is where he admittedly kept his drugs and his proceeds from their sale. A rational juror could reasonably infer that White had accessed the safe recently, because he knew how many pills and how much cash it contained. The gun was kept right next to these items, immediately visible and accessible whenever the safe was opened. White suggested someone else must have put the gun in his safe during a party. A rational juror could easily disbelieve this explanation, however, and instead reasonably infer that White had knowledge of, and dominion over, the gun locked in his bedroom closet safe with his drugs and cash. *See United States v. Volkman*, 797 F.3d 377, 391 (6th Cir. 2015) (finding constructive possession where defendant had access to a workplace safe containing a gun). Drawing all reasonable inferences in the government's favor, the evidence is more than sufficient to lead a rational trier of fact to conclude that White constructively possessed the firearm.

White further argues there is no evidence establishing a nexus between the gun and his drug trafficking activities. Under 18 U.S.C. § 924(c)(1)(A), any person "who, in furtherance of [a drug trafficking] crime, possesses a firearm, shall, in addition to the punishment provided for . . . [the] drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years[.]" To prove that possession was "in furtherance of" the drug trafficking crime, the government must show a "specific nexus between the gun and the crime charged" and that the firearm was "strategically located so that it [was] quickly and easily available for use." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). Other factors to consider include:

(1) "whether the gun was loaded," (2) "the type of weapon," (3) "the legality of its possession," (4) "the type of drug activity conducted," and (5) "the time and circumstances under which the firearm was found." *Id.*

The government argued at trial that White had strategically located his gun and ammunition with his drugs and drug proceeds so he could easily access it if he needed to protect his business. A rational juror could credit this theory and conclude, in light of the *Mackey* factors, that White possessed the gun in furtherance of his drug crimes. White stipulated to having a prior felony conviction and could not legally possess a gun. Moreover, the gun's serial number was obliterated, facilitating its illicit use because it could not easily be traced. Although the gun was not loaded, it would take little time to load it with the magazine kept directly underneath it. *See United States v. Sales*, 247 F. App'x 730, 736 (6th Cir. 2007) (finding sufficient evidence to support an "in furtherance" conviction where, in addition to loaded weapons, "[t]he .12 gauge shotgun, albeit unloaded, was in the kitchen near a bag of rifle ammunition and the refrigerator containing marijuana."). "When a weapon is found in a locked safe placed alongside contraband, there is sufficient evidence for a jury to determine that a defendant is in possession of a firearm in furtherance of a drug-trafficking crime." *Volkman*, 797 F.3d at 391. Drawing all inferences in support of the verdict, we conclude that a rational trier of fact could find that White possessed a gun in furtherance of his drug business.

III.

Finding no reversible error, we affirm the district court's judgment.