IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1999 SESSION



**FILED**

**August 4, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. No. 02C01-9806-CC-00170 |
| Appellee, | ) | |
| | ) | Madison County |
| v. | ) | |
| | ) | Honorable Franklin Murchison, Judge |
| JEFFERY JERMAINE HANKINS, | ) | |
| | ) | (Murder Second Degree) |
| Appellant. | ) | |

FOR THE APPELLANT:

Jesse H. Ford, III
Ford & Mayo
618 North Highland
P. O. Box 1625
Jackson, TN 38302-1625
(On Appeal)

Daniel J. Taylor
Assistant Public Defender
227 West Baltimore Street
Jackson, TN 38301-6137
(At Trial)

Joseph L. Patterson
225 West Baltimore Street
Jackson, TN 38301-6137
(At Trial)

FOR THE APPELLEE:

Paul G. Summers
Attorney General & Reporter

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Jerry G. Woodall
        District Attorney General

Donald H. Allen
Assistant District Attorney General
225 Martin Luther King Drive
        P. O. Box 2825
Jackson, TN 38302-2825

OPINION FILED: _____

AFFIRMED

L. T. LAFFERTY, SENIOR JUDGE

# O P I N I O N

The appellant, Jeffery Jermaine Hankins, herein referred to as "the defendant," appeals as of right from the judgment of the Madison County Criminal Court as a result of a jury conviction for murder second degree. At the conclusion of a sentencing hearing, the trial court imposed a sentence of twenty-five years as a Range I, standard offender, to run consecutively with sentences the defendant was currently serving in the Department of Correction. The defendant presents five issues for appellate review:

1. Whether the evidence was sufficient to support a verdict of guilt.

2. Whether the trial court erred in overruling the defendant's objections to introduction of photographs of the victim, which were inflammatory and more prejudicial than probative.

3. Whether the trial court erred in allowing a relative of the victim, Officer Mark Reeves, to testify regarding the victim's injuries and which amounted to victim impact, as there was sufficient medical proof available on that issue.

4. Whether the trial court erred in permitting the state to cross-examine the defendant regarding his two convictions for aggravated robbery and for possession of a weapon for impeachment purposes should the defendant testify.

5. Whether the defendant's right to a speedy trial was violated due to numerous continuances requested by the state and granted by the trial court.

After a careful review of the entire record, briefs of the parties, and applicable law, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

Larry Bushart, Jr., a Jackson police officer, testified that, on the morning of January 6, 1993, he responded to a call at the dead-end of Roosevelt Parkway. This street runs between the housing projects, Lincoln Courts and Parkway East Apartments. Officer Bushart found a deserted 1987 Chrysler LeBaron, with the Tennessee license number, ZOW022. Officer Bushart observed the body of a female lying in some weeds a short

distance away. Officer Bushart believed there was blood on the ground between the car and the body.

Michael Turner, crime scene technician for the Jackson Police Department, testified that, upon arrival at the scene, he began taking photographs of the body. The body was located forty feet from the Chrysler. The body had no shoes. The Chrysler was stuck in the mud with a two-by-four wedged under the tire. Nearby, Officer Turner observed a lady's shoe, a white sweater, and some white tissue with blood on it. The victim's hands had scratches and scrapes on the back. In the car, Officer Turner found a purse, a blue towel, a pair of pantyhose, and a belt. Officer Turner collected the two-by-four that was wedged under the tire and another two-by-four that was lying nearby. Officer Turner had the car towed from the scene, and it was secured for obtaining hair and fiber samples, fingerprint latents, and any other evidence. The headrest attached to the driver's seat was bent forward, and the rear view mirror was lying in the console. Officer Turner obtained a number of latent prints from the car, including some photographs of latents.

Officer Ted Maxwell testified that he made sketches of the scene and obtained the victim's clothing at the hospital. Officer Maxwell identified a white sweater with blood on the back taken from the scene.

Mark Reeves, criminal investigator for the Jackson Police Department, testified he contacted Investigator Golden and requested that he be permitted to view the body for possible identification. Officer Reeves went to the hospital, viewed the body, and observed a head injury on the victim. Officer Reeves identified the victim as Teresa Wills, his first cousin.

Clovis Stanfill testified that he rented an apartment to the victim in Lexington, Tennessee. On January 5, 1993, the victim asked to borrow his car, a 1987 Chrysler LeBaron, so she could apply for a job. Mr. Stanfill gave the victim his car at approximately 5:00 p.m. Mr. Stanfill last spoke to the victim around 11:00 p.m. when the victim called

3

him and told him she was watching a movie with a friend. Later, Mr. Stanfill's car was returned to him with damage to the left side, including the headrest and rearview mirror.

Doris Jackson, criminal investigator with the Jackson Police Department, testified she assisted Investigator Golden with the investigation of Teresa Wills's death. Investigator Jackson sent to the FBI Crime Lab certain items that she obtained from Officers Maxwell and Turner, along with the victim's clothing, shoes, white tissue, vacuum sweepings from the car, sexual assault kits, and two two-by-fours.

Dr. J. T. Francisco, county medical examiner and forensic pathologist consultant, testified he performed an autopsy on the victim on January 7, 1993. Dr. Hnlica assisted in the autopsy. Dr. Francisco found multiple injuries to the victim's body, including a skull fracture, a fractured jaw, and bruises and tears to the face, scalp, shoulders, forearms, and the back of the victim's hands. These injuries were caused by a blunt object such as a two-by-four. Dr. Francisco estimated the victim was severely struck more than two dozen times. As part of the autopsy, Dr. Francisco collected specimens for a rape kit. The specimens consisted of vaginal and anal swabs and hair and blood samples. Dr. Francisco testified the victim had cocaine and cocaine metabolites present in her body. Dr. Francisco found no injury to the victim indicating a rape.

Investigator Gerald Golden of the Jackson Police Department testified he obtained the rape kit from Dr. Francisco, which was forwarded to the FBI Crime Lab. On January 19, 1993, Investigator Golden interviewed the defendant and took the defendant to the office of Dr. T. K. Ballard for the collection of head, hair, pubic hair, and blood and saliva samples, which were sent to the FBI.

Douglas Deedrick, special agent for the FBI, testified he is the unit chief of the Trace Evidence Unit, which examines hair and fiber samples for identification. On January 25, 1993, Agent Deedrick received certain items for analysis from the Jackson Police Department. Agent Deedrick assigned certain items to the respective units for fingerprint

4

and DNA analysis. In examining the victim's white sweater, Agent Deedrick found treated head hairs consistent with the victim's hair and one Negroid hair which matched the sample taken from the defendant. Hairs found on the victim's pants were not suitable for comparison. In examining the two-by-four found adjacent to the Chrysler, Agent Deedrick found a treated hair fragment. The racial origin of the fragment could not be determined. Agent Deedrick identified certain hairs of the victim found in the car, which had been forcibly removed from her head. Agent Deedrick also identified a pubic hair found in the rear seat, which matched the defendant's sample. Another Negroid pubic hair was found on the rear floorboard, which did not match the defendant. Agent Deedrick did not make a comparison of the hair samples against any other person other than the defendant. Agent Deedrick agreed that hair identification does not have the same certainty as fingerprint identification.

Audrey Lynch, special agent for the FBI and DNA analyst, testified that DNA is the genetic material each person receives from their mother and father at conception and is "a master blue-print that contains all of the information to make you what you are." Agent Lynch described DNA as different for every individual, except for identical twins. Agent Lynch testified she received certain specimens for DNA analysis from Agent Deedrick for the Jackson Police Department. In analyzing the victim's white sweater, Agent Lynch found the presence of semen, which matched the defendant's known blood sample or could have come from a person possibly having the defendant's same DNA profile. In analyzing the victim's pants, Agent Lynch found semen present, which matched the defendant's known blood sample. Agent Lynch, in analyzing the white tissue found at the scene and the victim's panties and pantyhose, was not able to determine the origin of the semen present. Agent Lynch also found the presence of semen on the vaginal swabs taken from the victim. The DNA profile from the semen on the swabs matched the DNA profile from the defendant's blood sample. Agent Lynch testified that if blood samples were taken from 20,000,000 black persons, she would expect to see only one of those individuals with the same DNA profile as the defendant. Agent Lynch testified the FBI has a data bank of 500 Negro persons from which the experts extrapolate their conclusions as

5

to a DNA profile on a certain individual.

Patty Hopper testified she met the victim two weeks prior to her death. On January 5, 1993, Hopper and the victim met at the Dollar Store in Lexington, Tennessee at 5:00 p.m. They decided to go to Jackson "to mess around." They drove to Jackson in the victim's car and went to Berry Street, where they met a man named "Slick." The victim went inside a house to talk to "Slick," while Hopper remained in the car. The victim returned to the car, and the women went to East Chester Street looking for some crack cocaine. They met two men and purchased some crack cocaine, which they smoked. The victim and Hopper then went with the two men to find more cocaine. They found additional cocaine and smoked it. About midnight, the women took one of the men, Tony or Anthony, to the Lincoln Courts area looking for more crack, but they needed more money or to make trade. At Lincoln Courts, Tony left them in the car and returned with the defendant. Tony and the defendant got into the back seat. The victim told the defendant they did not have any money, but she would trade her body for crack. The defendant gave Tony $9.00 to buy some crack. While Tony was gone, the defendant told the victim, "Y'all white bitches think y'all are going to come down and trick us for our dope and stuff. Y'all are going to be the ones that are going to get tricked. There ain't nobody white that comes in these projects and leaves alive." The victim told the defendant she did not want to have sex. The defendant said, "I'll kill you, white bitch." Hopper got out of the car and began walking away, while the defendant and the victim were still in the back seat. Hopper heard a "loud banging," turned around and saw the defendant slam the victim's head against the rear window. The victim was screaming at Hopper, "Help me. Help me."

Hopper went to several doors in an attempt to call the police, but no one would answer the door. As Hopper left the Lincoln Courts, she saw Tony and told him, "They're into it down there," and that he should separate them. An elderly man in an apartment told Hopper that he would call the police. Hopper then stopped an individual in a truck and asked for a ride to the interstate. She had to have sex with the individual in his apartment in exchange for the ride. When the police interviewed Hopper on January 6, 1993, she did

6

not tell them what had happened because she was scared. Hopper admitted she had a history of drug use. Hopper testified she did not ask the truck driver to take her to the police. Hopper admitted she did not know who killed the victim. Hopper also agreed she had lied to the police in her prior written statement.

Anthony Reed, also known as Tony, testified he knows the defendant by the name "J." On January 5, 1993, Reed saw the victim and another woman at the Exxon on East Chester Street in a Chrysler LeBaron. The victim called to Reed by the name of "Tony." The victim wanted to pawn the car for some drugs, because she did not have any money. Reed informed her, "We can just check a few places." Reed drove the car to the Lincoln Courts area, where he saw the defendant. Reed asked the defendant and two others if they could "put the car on pawn" (meaning for drugs). The defendant wanted to see who was in the car. The defendant got in the car and drove it to the dead-end. The defendant talked to the victim and Hopper, trying to see what they wanted for the car and possible sexual favors for the drugs. The victim did not want to have sex, but wanted to pawn the car. The defendant gave Reed $9.00 to buy some cocaine, so Reed left. When Reed left, the defendant and the victim were arguing over the amount to pawn the car. Reed returned to the car, and the defendant told him to keep the $9.00. Reed left the defendant with the two women. Later, Reed saw the defendant drive the car out of Lincoln Courts with the victim, but the other woman was not in the car. Reed saw the woman in a truck with two men, one known as "T."

In a few hours, Reed saw the defendant, who said, "I think I done killed the bitch." Reed said, "What bitch?" The defendant responded, "The woman I was with earlier tonight." The defendant had a cut on his left hand which was bleeding. Reed testified the defendant wanted him to go with him and shoot the "bitch" in the head. Reed believed the defendant was joking and did not take him seriously. Two days later, Reed learned that the victim was dead. Reed agreed he did not tell the police everything, because he was scared. During cross-examination, Reed testified when he left the defendant and the victim, he bought some cocaine and got high.

7

J. R. Golden, an investigator for the Jackson Police Department, testified he interviewed the defendant on January 19, 1993, after advising him of his rights through a waiver form. The defendant agreed to give a statement. In his statement, the defendant related to Investigator Golden that he saw a white woman from Lexington driving around in the Parkview Courts on January 4, 1993, looking for drugs. She gave a person some money to buy her some drugs. The defendant knew this woman from November 1992, when she had come to Jackson and wanted the defendant to go with her to purchase some drugs. At that time, she bought $300 worth of drugs and gave the defendant some. The defendant further related in his statement that the woman would spend all her money on drugs and would do anything to get more. The defendant stated he was never with the woman on January 5 or 6, 1993, nor had he ever been in a car with her. During cross-examination, Investigator Golden testified the defendant voluntarily appeared for questioning and was cooperative in giving head, hair, pubic hair, and blood samples.

Michael Turner, crime scene technician, was recalled and testified that the latent fingerprints taken from the car were sent to the FBI and that he had received the report on the comparison of these latent prints involving the defendant and the victim. The report stated seven latent fingerprints were identified as the impressions of the victim. None of the latent prints matched the defendant's fingerprints.

Larry Taylor, testifying for the defense, stated he was driving down LaBelle Street on January 6, 1993, after midnight, when he saw Patty Hopper walking out of the Lincoln Courts. Taylor stopped his truck and offered her a ride. She wanted to go to Lexington, but Taylor told her he could not take her that far. While riding, Taylor offered Hopper $10.00 in exchange for sex. Hopper did not appear upset. She stated her friend and her boyfriend were "into it" at the Lincoln Courts. She did not ask to be taken to the police. First, Hopper wanted to get some crack, so they drove around, but could not find any. While driving down Hale Street, "Don" yelled at Taylor. Don and Hopper knew each other, and they all went back to Hale Street, where Don and Hopper went into a house and used drugs. Hopper later came out and went with Taylor to his apartment where they had sex.

8

Afterwards, Taylor took Hopper to a truck stop.

Edward Lewis Lampley, also known as "Slick," testified that the victim and Hopper came to his house around 6:30 p.m. on January 5, 1993. They went looking for a friend of Lampley's, Rob Pirtle, but could not find him. They then drove to the Parkview Courts, where the victim called out to a man she knew and bought some cocaine. They drove around smoking the cocaine. When they ran out of money, the victim wanted to go back to Lexington for more money, and Lampley went home. Lampley learned about the victim's death the next day. Lampley and the women did not have sex, nor were any offers of such made.

Gureka Clark testified the defendant is her boyfriend and father of her 4-year-old child. Ms. Clark testified that in January 1993, she was nine months pregnant and had trouble climbing stairs. She went upstairs every night about 10:00 p.m., and the defendant was always there. Ms. Clark testified she was sure the defendant was in her apartment at 10:00 p.m. on January 5, 1993, and he never left the apartment. During cross-examination, Ms. Clark testified she and the defendant had a conflict in December 1992, but reconciled before New Year's Eve. Ms. Clark learned of the murder from the news.

The defendant elected not to testify.

## LEGAL ANALYSIS

### A.

### SUFFICIENCY OF EVIDENCE

The defendant contends, based upon the evidence in this record, a rational trier of fact could not have found the essential elements of the offense of murder second degree beyond a reasonable doubt. The State argues there was overwhelming evidence to support the jury's verdict.

When there is a challenge to the sufficiency of the evidence, the State is entitled to the strongest view of the proof at trial and all reasonable inferences which might have been drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn. 1978). A jury verdict, approved by the trial court, accredits the testimony of the witnesses for the State and resolves any conflicts in the evidence in favor of the State's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn. 1983), *cert. denied,* 465 U.S. 1073, 104 S. Ct. 1429, 79 L. Ed. 2d 753 (1984). This Court may neither reweigh nor reevaluate the proof offered at trial and must not substitute its inferences for those drawn by the trier of fact. *Liakas v. State,* 199 Tenn. 298, 286 S.W. 2d 856, 859 (1956), *cert. denied,* 352 U.S. 845, 77 S. Ct. 39, 1 L. Ed. 2d 49 (1956). The ultimate issue is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); Tenn. R. App. P. 13(e).

A criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State,* 505 S.W.2d 237, 241 (Tenn. 1973), *cert. denied,* 419 U.S. 877, 95 S. Ct. 141, 42 L. Ed. 2d. 117 (1974). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *State v. Crawford,* 470 S.W.2d 610, 613 (Tenn. 1971); *State v. Matthews,* 805 S.W.2d 776, 778 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1990).

Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). This Court will not disturb a verdict of guilt due to the sufficiency of evidence, unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact

10

to find the defendant guilty beyond a reasonable doubt. *Id.* at 914.

A review of the evidence in this record establishes that the State's proof is wholly circumstantial. Although the indictment in this cause accuses the defendant of murder first degree, the jury returned a verdict of murder second degree. Therefore, in order for the State to meet its burden of proof at trial, the State must prove beyond a reasonable doubt the essential elements of murder second degree. Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(1).

The State proved beyond a reasonable doubt that the victim died from multiple blunt blows to the head, thus constituting an unlawful homicide. Two State witnesses, Patty Hopper and Tony Reed, testified they last saw the victim alone with the defendant. Special Agent Deedrick identified two suspect hairs as the defendant's, which were recovered from the victim's white sweater and from the rear seat of the 1987 Chrysler. Special Agent Lynch testified that, through DNA analysis, she determined the semen stain found on the victim's white sweater was the defendant's. Also, the semen stain found on the victim's pants was identified as the defendant's. Anthony Reed testified that the defendant told him, "I think I done killed the bitch . . . the woman I was with earlier tonight." Although the defendant, through his statement to Investigator Golden, denied he was with the victim on the morning of January 6, 1993, the forensic evidence supported the State's theory that the defendant killed the victim. The inconsistencies and credibility of the witnesses, Patty Hopper and Anthony Reed, were placed before the jury. The credibility of witnesses, the weight to be given their testimony, and the reconciliation of inconsistencies in the proof are matters entrusted exclusively to the jury as the trier of fact. *State v. Sheffield,* 676 S.W.2d 489, 491 (Tenn. 1984). The jury resolved these inconsistencies in favor of the State. We find the State has established sufficient circumstantial evidence, beyond a reasonable doubt, that the defendant committed murder second degree. The defendant has not carried his burden on appeal of demonstrating why the evidence is insufficient to support his conviction. This issue has no merit.

11

**B.**

**PHOTOGRAPHS**

The defendant contends the trial court erred in permitting the State to introduce photographs of the victim, which in effect emotionally shocked and horrified the jury. The defendant argues that the photographic evidence introduced led to unfair prejudice. In essence, the defendant argues that the photographs were cumulative, since the live testimony of the pathologist, Dr. Francisco, sufficiently established the cause of death, and all the wounds on the body were adequately described for the jury. The State counters that the defendant fails to claim which photographs are the basis of the alleged abuse of discretion, and the trial court's review of the photographs establishes the trial court acted properly in admitting the photographs.

The controlling authority regarding the admissibility of photographs of murder victims in Tennessee is *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978). The Supreme Court held that the determination of the admissibility is within the discretion of the trial court after considering their relevance, probative value, and potential unfair prejudicial effect of such evidence. *See* Tenn. R. Evid. 403. The general rule, as stated in *Banks,* is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id.* at 950-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951.

The record establishes that the trial court, in a pre-testimony conference, ruled on the admissibility of certain photographs taken of the victim at the scene. The trial court ruled photographs of the victim's hands were admissible to support the medical testimony that the wounds were defensive in nature. The trial court permitted the introduction of one photograph of the victim's face, obscured by overgrown vegetation, on the grounds that the body was concealed and not as being gruesome. As to the photographs taken in a second

roll at the scene, the trial court permitted repetitious photographs of the victim's hand and a photograph of the back of the victim's head in the grass. The trial court denied the State's request to introduce two photographs of the victim's head taken at the scene as too gory and gruesome. Our Supreme Court has stated that photographs of the victim may be admitted "as evidence of the brutality of the attack and the extent of force used against the victim, from which the jury could infer malice, either expressed or implied." *State v. Brown,* 836 S.W.2d 530, 551 (Tenn. 1992).[1] *State v. Robert Goss & Carl Hale,* No. 02C01-9610-CC-00367, 1998 WL 779611, at *10 (Tenn. Crim. App., Jackson, November 10, 1998). We have reviewed the photographs in this record, and we agree with the State that the photographs were relevant to support the testimony of the medical examiner and the investigating officer in establishing the cause of death. *State v. Stephenson,* 878 S.W.2d 530, 542 (Tenn. 1994). The defendant has failed to show an abuse of discretion as to the admissibility of these photographs, and, thus, there is no merit to this issue.

## C.
### VICTIM IMPACT

The defendant contends that the trial court erred in permitting the victim's relative, Officer Mark Reeves, to testify regarding the victim's injuries. The defendant argues that this testimony amounted to victim impact and was cumulative at most. The State responds the trial court did not abuse its discretion in permitting a relative to testify as to his identification of the victim.

The Victim Impact Statement Act, Tenn. Code Ann. § 40-38-203, defines:

> (1) "Victim" means an individual who suffers direct or threatened physical, emotional, or financial harm as the result of the commission of a crime, or an immediate family member of a minor victim or a homicide victim.

> (2) "Victim impact statement" means a statement providing information about the financial, emotional, and physical effects of the crime on the victim and the victim's family, and specific

---

[1] We note in the record the trial court sustained the defendant's objection to a photograph taken by Dr. Francisco to be viewed by the jury.

13

information about the victim, the circumstances surrounding the crime, and the manner in which it was perpetrated; and

(3) "Victim representative" means a spouse, parent, child, sibling, or other relative of a deceased or incapacitated victim or of a victim who is under eighteen (18) years of age, or a person who has had a close personal relationship with the victim and who is designated by the court to be a victim representative.

Victim impact statements are relevant to sentencing considerations by the trial court and not to the determination of guilt or innocence of an accused. In reviewing the record, the testimony of Officer Reeves cannot be considered a victim impact statement; rather, his testimony was factual as to the identification of the victim. The State is obligated to "establish the corpus delicti in cases of homicide that must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed." *Bolden v. State,* 140 Tenn. 118, 203 S.W. 755 (1918). Although the defendant argues that Officer Reeves testified regarding the victim's serious head injury, the record establishes the trial court cautioned the State about questioning a relative as to the severity of the victim's injury. In response to the State's question, Officer Reeves testified he observed the victim's head injury. Since the witness did not go into the severity of the victim's injury, we find the trial court did not abuse its discretion in permitting Officer Reeves to testify as a corpus witness. There is no merit to this issue.

## D.

## PRIOR CONVICTIONS

The defendant complains that the trial court erred in permitting the State to impeach him, should he have taken the witness stand, with two prior convictions for aggravated robbery and for the possession of a weapon during the commission of a felony. The defendant complains the use of the defendant's prior violent felony convictions is in many ways similar to the charge of murder second degree. The State contends the trial court did not abuse its discretion in permitting the State to impeach the defendant's testimony

14

with the convictions for aggravated robbery.[2]

It is undisputed that the State filed a notice to seek the impeachment of the defendant's testimony with prior convictions. Tenn. R. Evid. 609(a)(3). Tennessee Rule of Evidence 609(a)(3) provides that the trial court, upon request, must determine if the prior conviction or convictions' probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. Further, the trial court may rule on the admissibility of such proof prior to the trial, but, in any event, shall rule prior to the testimony of the accused. If the trial court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination. Pursuant to Rule 609, prior convictions must be for a crime punishable by incarceration in excess of one year, or for a crime involving dishonesty or false statement. *State v. Blanton,* 926 S.W.2d 953, 959 (Tenn. Crim. App. 1996). In making its determination, the trial court must: (1) assess the similarity between the crime on trial and the crime underlying the impeaching conviction; and (2) analyze the relevance the impeaching conviction has as to the issue of credibility. *Id.* at 959; *see State v. Barnard,* 899 S.W.2d 617, 622 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1994).

In its ruling, the trial court considered the defendant's prior convictions for aggravated robbery and did not find much similarity between those offenses and the offense of murder first degree but found the prior convictions for aggravated robbery and felony possession of cocaine for delivery admissible. We conclude that the crimes of aggravated robbery and unlawful possession of cocaine with the intent to deliver are not so similar to the offense of murder second degree as to compel finding of prejudice. Accordingly, we conclude the trial court did not err in finding the defendant's convictions

---

[2]Although the defendant contends the trial court permitted impeachment of the defendant with the conviction for possession of a weapon in the commission of a violent felony, the record establishes the trial court did not permit the State to do so. The trial court found the possession of weapon charge merged with the convictions for aggravated robbery. However, the trial court did permit the State to impeach the defendant with a conviction for the unlawful possession of cocaine with the intent to deliver, occurring after the date of the offense for murder second degree.

for aggravated robbery and the felony drug conviction usable for the impeachment as to the defendant's credibility on the substantive offense of murder second degree. *Blanton,* 926 S.W.2d at 960. There is no merit to this issue.

## D.

## DENIAL OF DEFENDANT'S RIGHT

## TO A SPEEDY TRIAL

The defendant contends that the trial of his case, approximately four years after the offense, was so prejudicial that he was denied a fair trial. The State responds that the trial court properly denied the defendant's motion to dismiss the indictment due partially to the fact that the defendant's requests for a speedy trial were not constant but intermittent.

As a basis for this contention, the defendant acknowledged that it was difficult to establish prejudice by the delay of his trial, and witnesses were unavailable to support that argument. The speedy trial guarantee of the Sixth Amendment is designed to "minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald,* 456 U.S. 1, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982). This right attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial. *United States v. Loud Hawk,* 474 U.S. 302, 310-12, 106 S. Ct. 648, 65-54, 88 L. Ed. 2d 640 (1986).

When a defendant contends he was denied his right to a speedy trial, the reviewing court must conduct a four-part balancing test to determine if this right was indeed abridged. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2128, 2192, 33 L. Ed. 2d 101 (1972); *State v. Vickers,* No. 02C01-9609-CC-00313, 1997 WL 370357, at *3 (Tenn. Crim. App. Jackson, July 3, 1997), *per. app. denied* (Tenn. 1998). This test includes consideration of: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right;

16

and (4) the actual prejudice suffered by the defendant because of the delay. *State v. Vickers,* 1997 WL 370357, at \*3; *State v. Bishop,* 493 S.W.2d 81 (Tenn. 1973). When the defendant seeks the dismissal of a prosecution, based upon denial of a speedy trial, the defendant must establish a period of delay that is "presumptively prejudicial." *State v. Jefferson,* 938 S.W.2d 1, 11 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1996).

The length of the delay between indictment and trial is a threshold factor, and, if that delay is not presumptively prejudicial, this Court will not consider the other factors. *Barker,* 407 U.S. at 530. A delay of one year or longer "marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry." *Doggett v. United States,* 505 U.S. 647, 652, 112 S. Ct. 2686, 2691, n.1, 120 L. Ed. 2d 520 (1992). Therefore, we must review the record to ascertain the reasons for the delay of almost four years in this case. Possible reasons for delay are said to fall within four identifiable categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused or acquiesced in by the defense. *State v. Wood,* 924 S.W.2d 342, 346-47 (Tenn. 1996); *Vickers,* 1997 WL 370357, at \*3. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay. *Barker,* 407 U.S. at 531.

In the present case, the record establishes that the defendant was indicted by the Madison County grand jury on March 1, 1993. Five factual witnesses listed on the indictment, Patty Hopper, Clovis Stanfill, and Tony Reed for the State, two witnesses for the defense, Larry Taylor and Edward Lampley, all testified at trial. The record is clear that the defendant did not offer any proof or a proffer of proof to establish any prejudice for the delays in this case. Ordinarily, the statements of counsel are not evidence as to the reasons for the delay in this case. However, assuming statements of counsel are correct, in the motion for dismissal, or in the alternative, a continuance, we are convinced the defendant has failed to establish any prejudice in the trial court's denial of his motion to dismiss for lack of a speedy trial.

17

The statements of counsel reveal the defendant was indicted for two offenses of aggravated robbery and, while on bond, was accused of the charge in this case. Apparently, in this same time frame, the defendant was accused of a drug felony offense. Between March 1993, and June 1994, the defendant was convicted or pled guilty to two offenses of aggravated robbery, receiving concurrent sentences of twelve years, and pled guilty to unlawful possession of cocaine with the intent to deliver, receiving a sentence of eight years to run consecutively to the twelve years in the Department of Correction. In June 1994, Anthony Reed, a material witness for the State, disappeared because he was fearful for his life. The record reveals the defendant filed a motion for a speedy trial in December 1994. Reed returned to Jackson and was shot in an altercation in or about February 1996. However, in April 1996, Reed made a material witness bail bond and fled the State again, before the trial date of June 10, 1996. The State moved for a continuance, which the defendant did not join. In October 1996, while Reed was absent, the defendant again renewed his motion for a speedy trial. In November 1996, the trial court revoked Reed's bond, and Reed was taken into custody in January 1997. On January 30, 1997, the defendant requested the trial court to dismiss the indictment for the denial of a speedy trial or, in the alternative, a continuance to February 12, 1997 to seek essential witnesses. The trial court denied the motion to dismiss, but ordered the State to locate the defense witnesses sought by the defendant.

On February 10, 1997, the defendant reported he had three missing witnesses who could not be found. The defendant contended these witnesses would impeach the State's witness, Patty Hopper. During the time between trial and the hearing, one witness, Larry Taylor, was located and testified at trial.

The defendant has failed to establish any prejudice as to the unavailability of these two missing impeaching witnesses. In her testimony, Patty Hopper candidly admitted she did not tell the truth in her statements to the police. It is clear from the record that Anthony Reed was a material witness for the State. Reed put the defendant and the victim together and was the last person to see the victim alive with the defendant. The defendant told

18

Reed, "I think I done killed the bitch." Then, the defendant asked Reed to accompany him to put a bullet in the victim's head.

We believe the State's attempts to locate the missing witness, Tony Reed, were justifiable under the facts in this record. The defendant did exercise his right to seek a speedy trial as evidenced by the record, but we hold the trial court did not abuse its discretion in denying the motion to dismiss the indictment. Thus, based upon the entire record, we cannot conclude the defendant suffered undue prejudice from the denial of the motion to dismiss the indictment. There is no merit to this issue.

_____
L. T. LAFFERTY, SENIOR JUDGE

CONCUR:

_____
JOSEPH M. TIPTON, JUDGE

_____
DAVID G. HAYES, JUDGE