

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00172-CR

_____

DANIEL YOUNGBLOOD, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR15272

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell
Dissenting Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant Daniel Youngblood appeals his felony conviction for failure to stop and render aid following an accident involving death or serious bodily injury. *See* Tex. Transp. Code Ann. § 550.021. In two issues, Youngblood argues that the State violated his Sixth Amendment right to a speedy trial and that the trial court erred by refusing his request for a jury instruction on the lesser-included offense of misdemeanor failure to stop and render aid following an accident involving damage to a vehicle. *See id.* § 550.022. Because we conclude that Youngblood was denied his right to a speedy trial, we reverse Youngblood's conviction and render a judgment of acquittal.

## I. Background

On January 26, 2021, Seth Reagan was stopped at a red light when his vehicle was rear-ended by someone driving a BMW. Reagan's vehicle received minor damage. Reagan testified that he was "a little" dazed immediately after the collision and that he got a "cut" on his nose from a Red Bull can he had been drinking from at the time of the collision, which "bled a little bit" and required minor medical treatment. He did not go to the emergency room and otherwise refused medical attention. Following the collision, Reagan saw the driver of the BMW get out of the vehicle and then get back into the vehicle before driving away. The driver of the BMW did not approach Reagan's vehicle or speak to him but instead drove away within fifteen seconds of the collision.

State Trooper Marcus French responded to the scene of the collision and saw Reagan's vehicle and a trail of automobile fluid headed away from the scene of the collision. He followed the trail of fluid to an empty BMW with severe front-end damage parked approximately 300 feet up the road from Reagan's vehicle. Inside the vehicle, French found a Texas identification card and a debit card that apparently belonged to Youngblood. French subpoenaed bank records for the debit card and obtained security footage from the bank, which showed that Youngblood had driven a BMW to the bank and used the debit card to make a withdrawal at the bank's ATM at 6:45 p.m. on January 26, 2021.

In his investigative report dated February 10, 2021, French requested that arrest warrants be issued for Youngblood for both misdemeanor driving while license invalid with a previous conviction and felony failure to stop and render aid following an accident involving death or serious bodily injury. On April 29, 2021, Youngblood was arrested pursuant to the misdemeanor warrant. From the record it appears that no information was ever filed. Youngblood remained in jail, though, where he was served with the felony-arrest warrant on August 28, 2021.

Youngblood's jury trial began on July 11, 2022, and he was convicted on the felony charge. Youngblood and the State agreed on a five-year sentence of confinement and agreed to preserve all appellate issues raised during the guilt–innocence phase. Youngblood timely appealed.

## II. Sixth Amendment Right to a Speedy Trial

In his first issue, Youngblood contends that the delay from his initial arrest on April 29, 2021, until his trial on July 11, 2022, violated his Sixth Amendment right to a speedy trial. *See* U.S. Const. amend. VI. He argues that under the four-factor balancing test set out in *Barker v. Wingo*, he is entitled to a dismissal of the charges against him. 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972); *see also Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). To assist in evaluating Youngblood's speedy-trial claim, we will set out a detailed timeline below.

### A. Speedy-Trial Facts

- January 26, 2021, the collision with Reagan's vehicle occurs.

- February 10, 2021, Trooper French requests arrest warrants for both the misdemeanor and the felony offenses.

- April 29, 2021, Youngblood is arrested for the misdemeanor.

- August 28, 2021, Youngblood is arrested for the felony.

- October 6, 2021, Youngblood is indicted.

- October 19, 2021, Youngblood files a motion to proceed pro se.

- October 25, 2021, Youngblood files a pro se "application" for writ of mandamus with this court requesting that the trial court be ordered to give him a speedy trial, grant his motion to proceed pro se, and give him an examining trial.[1]

---

[1]The documents filed by Youngblood did not comply with the requisites for a petition for writ of mandamus. We sent noncompliance letters to Youngblood on October 26, 2021, and January 27, 2022, along with his unfiled documents. We received no further correspondence from Youngblood.

- November 9, 2021, Youngblood's appointed trial counsel withdraws as counsel and the trial court appoints new trial counsel. On the same day, Youngblood's newly appointed counsel files a motion to suppress.

- November 22, 2021, Youngblood's trial counsel files a motion for a speedy trial.

- December 13, 2021, Youngblood's trial counsel files an amended motion to suppress.

- January 18, 2022, the trial court hears and grants Youngblood's motion to proceed pro se.

- February 2, 2022, Youngblood files a motion to quash, which the trial court sets for hearing on March 14, 2022.

- February 7, 2022, Youngblood files another motion for a speedy trial, which the trial court sets for hearing on March 14, 2022.

- February 15, 2022, the trial court hears and denies Youngblood's amended motion to suppress.

- March 8, 2022, Youngblood files an amended motion for reconsideration to suppress evidence.

- March 14, 2022, Youngblood files an amended motion to quash and a petition for a writ of habeas corpus in the trial court requesting a court date, findings of fact, and a dismissal based on due process violations, unreasonable search and seizure, and unlawful arrest.[2]

- March 17, 2022, Youngblood files a motion in limine and a motion to disclose confidential informants.

- March 21, 2022, the State files responses to Youngblood's motion to quash and to his petition for writ of habeas corpus.

---

[2]The petition also asserts that Youngblood's Sixth Amendment rights had been violated, but it does not identify which rights or how they were violated.

- March 22, 2022, the State files a response to Youngblood's motion to disclose identity of confidential informants, and on the same day, the trial court hears Youngblood's motion to quash, petition for writ of habeas corpus, motion for reconsideration to suppress evidence, motion for a speedy trial, and motion to disclose identity of confidential informants.

- March 22, 2022, the State announces "ready" and the trial court sets Youngblood's case for trial on May 9, 2022.

- March 24, 2022, Youngblood files an amended petition for writ of habeas corpus in the trial court requesting only an examining trial.

- May 5, 2022, the trial court holds a status hearing to inform Youngblood that his May 9, 2022 trial setting is postponed until July 11, 2022. Youngblood asserts his right to a speedy trial and requests a special setting, which the trial court denies.

- May 17, 2022, Youngblood files a motion to dismiss on the grounds that his Sixth Amendment right to a speedy trial had been violated.

- June 28, 2022, the trial court hears and denies Youngblood's motion to dismiss.

- July 11, 2022, Youngblood's trial begins.

## B. The *Barker* Factors

The Sixth Amendment to the United States Constitution guarantees the accused in all criminal prosecutions the right to a speedy trial, which is extended to the states by the Due Process Clause of the Fourteenth Amendment. *Barker*, 407 U.S. at 515, 92 S. Ct. at 2184; *see* U.S. Const. amends. VI, XIV. To determine when a Sixth Amendment speedy-trial violation occurs, appellate courts apply a balancing test using the *Barker* factors. *See* 407 U.S. at 530, 92 S. Ct. at 2192; *Gonzales*, 435 S.W.3d at 808 (reciting *Barker* factors). Appellate courts weigh (1) the length of the delay, (2) the

reasons for the delay, (3) the defendant's assertion of his speedy-trial right, and (4) prejudice to the defendant because of the delay. *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192; *see State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021). The conduct of the State and the defendant are weighed under each factor, though no single factor alone is necessary or sufficient to establish a speedy-trial violation. *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193; *Black v. State*, No. 02-21-00057-CR, 2022 WL 3464563, at *3 (Tex. App.—Fort Worth Aug. 18, 2022, no pet.) (mem. op., not designated for publication); *Cochnauer v. State*, No. 02-19-00165-CR, 2021 WL 3931914, at *3 (Tex. App.—Fort Worth Sept. 2, 2021, no pet.) (mem. op., not designated for publication).

The length of the delay is, to an extent, a triggering mechanism for the remaining factors in the balancing test. *Lopez*, 631 S.W.3d at 113; *Black*, 2022 WL 3464563, at *3; *Cochnauer*, 2021 WL 3931914, at *3.

> Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to a speedy trial, the length of the delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.

*Barker*, 407 U.S. at 530–31, 92 S. Ct. at 2192; *see Lopez*, 631 S.W.3d at 113; *Dragoo v. State*, 96 S.W.3d 308, 313–14 (Tex. Crim. App. 2003). Notably, the Supreme Court has explained that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192.

7

If a presumptively prejudicial delay has occurred, the State bears the initial burden of justifying the delay. *Black*, 2022 WL 3464563, at \*3; *Harper v. State*, 567 S.W.3d 450, 459 (Tex. App.—Fort Worth 2019, no pet.). The defendant, in turn, has the burden to prove both his diligent assertion of his right to a speedy trial and to show prejudice. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008); *see Black*, 2022 WL 3464563, at \*3. The defendant's burden on the third and fourth factors "varies inversely with the State's culpability for the delay; the greater the bad faith or official negligence on the part of the State, the less a defendant must show assertion of the right or prejudice." *Black*, 2022 WL 3464563, at \*3 (first citing *Cantu*, 253 S.W.3d at 280–81; and then citing *Bender v. State*, No. 02-17-00342-CR, 2018 WL 4401745, at \*5 (Tex. App.—Fort Worth Aug. 23, 2018, no pet.) (mem. op., not designated for publication)).

**C. Standard of Review**

In our review, we apply an abuse of discretion standard for the factual components, giving "almost total deference to historical findings of fact of the trial court that the record supports and draw[ing] reasonable inferences from those facts necessary to support the trial court's findings." *Gonzales*, 435 S.W.3d at 808–09; *see Lopez*, 631 S.W.3d at 113–14. We review de novo "whether there was sufficient presumptive prejudice to proceed to a *Barker* analysis and the weighing of the *Barker* factors, which are legal questions." *Gonzales*, 435 S.W.3d at 809. However, "while an evaluation of the *Barker* factors includes fact determinations and legal conclusions,

8

'the balancing test as a whole is a purely legal question that we review *de novo*.'" *Lopez*, 631 S.W.3d at 114 (quoting *Balderas v. State*, 517 S.W.3d 756, 767–68 (Tex. Crim. App. 2016)).

## D. Analysis

### 1. Length of the Delay

At the outset, Youngblood was required to make a threshold showing that the length of the delay was presumptively prejudicial. *See Gonzales*, 435 S.W.3d at 808; *Black*, 2022 WL 3464563, at *4. Presumptive prejudice "simply marks the point at which courts deem the delay unreasonable enough to trigger [the *Barker*] enquiry." *Lopez*, 631 S.W.3d at 114 (quoting *State v. Munoz*, 991 S.W.2d 818, 821–22 (Tex. Crim. App. 1999)). "When the length of delay stretches well beyond the bare minimum needed to trigger a full *Barker* analysis, the length of [the] delay weighs against the State, and the longer the delay, the more the defendant's prejudice is compounded." *Gonzales*, 435 S.W.3d at 809 (footnote omitted).

To calculate the delay length, we measure from the time that the accused is arrested or formally accused. *Id.* An "accusation" occurs when the defendant is either arrested or formally charged with a crime. *Id.*; *Black*, 2022 WL 3464563, at *4. The speedy-trial clock thus starts when a formal indictment, information, or actual arrest occurs. *Cochnauer*, 2021 WL 3931914, at *3; *see also United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971).

9

Youngblood and the State disagree on when the speedy-trial clock started. Youngblood contends that the speedy-trial clock started when he was first arrested for criminal conduct pursuant to the misdemeanor warrant on April 29, 2021. Beginning the clock on April 29, 2021, would amount to a 438-day delay, or approximately fourteen-and-a-half months. The State, on the other hand, argues that the speedy-trial clock did not start until Youngblood was arrested for the felony charge[3] on August 28, 2021, which would amount to a 317-day delay, or approximately ten-and-a-half months. Regardless of whether the speedy-trial clock started on April 29, 2021, or August 28, 2021, we conclude that, based on the peculiar circumstances of this case, either would sufficiently trigger the *Barker* analysis.

Although there is no set amount of time necessary to trigger the *Barker* analysis, it appears that the facts of this case are not typical with respect to when the speedy-trial clock begins to run. "Previous Texas authorities hit around the question, but do so in different contexts." *Stone v. State*, No. 08-16-00343-CR, 2018 WL 1737076, at *4 (Tex. App.—El Paso Apr. 11, 2018, pet. ref'd) (not designated for publication).

In *Lopez*, the defendant was arrested on April 18, 2017, pursuant to a felony charge. 631 S.W.3d at 110. On July 12, 2017, the State dismissed the felony charge and reduced it to a misdemeanor charge based on the same criminal conduct. *Id.* The trial court set the case for trial on August 8, 2017, and ultimately granted the defendant's

---

[3]During oral arguments, counsel for the State argued that the speedy-trial clock started the date of the felony arrest. In its brief, however, the State appears to argue that the speedy-trial clock started when Youngblood was indicted on October 6, 2021.

motion to dismiss on speedy-trial grounds. *Id.* at 111, 112. In its review of an asserted speedy-trial violation, the Court of Criminal Appeals measured the delay "from the time of [the defendant's April 18, 2017] arrest to the August 8[] trial date," or 112 days in jail, despite the subsequent misdemeanor charge filed on July 12, 2017. *Id.* at 114–15. The Court of Criminal Appeals acknowledged that the speedy-trial clock started on the date of the defendant's initial arrest for the felony, not the date of the misdemeanor charge for which he would have been tried. *See id.* at 114.[4]

Conversely, in *Stone*, the defendant was arrested for misdemeanor driving while intoxicated (DWI) on March 27, 2015. 2018 WL 1737076, at *1. Over the next eighteen months, the defendant was formally charged with the misdemeanor, the case was set and reset for trial multiple times, the State subpoenaed several witnesses, and the defendant filed motions for a speedy trial. *Id.* at *1–2. In July 2016, the State informed the trial court that the case was being presented to a grand jury, and on September 6, 2016, a grand jury returned an indictment for the felony offense of intoxication assault. *Id.* at *2. The defendant then filed a motion to dismiss for want of speedy trial on September 26, 2016. *Id.* The El Paso Court of Appeals, however, declined to measure the length of the delay from the date of the defendant's initial arrest on March 27, 2015, and instead concluded that the speedy-trial clock began on September 6, 2016, the date of the felony indictment. *Id.* at *6. The court reasoned

---

[4]Although the court ultimately held that the 112-day delay was not presumptively prejudicial and insufficient to trigger an analysis of the remaining *Barker* factors, we cite this case for guidance only in calculating the delay.

that "[o]nly after making a more careful consideration of whether it could prove beyond a reasonable doubt a novel medical causation question did the State elevate the charge to a felony." *Id.*

We find persuasive a federal case from the United States Court of Appeals for the Second Circuit, in which the court concluded that "[g]iving each charge its own relevant time period for assessing delay could subject a criminal defendant to nearly ceaseless pre-trial detention due to superseding indictments, each time justified by a new charge with a new element." *United States v. Black*, 918 F.3d 243, 258 (2d Cir. 2019). Quoting the United States Supreme Court, the Second Circuit reasoned that "the speedy[-]trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial . . . [and] shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *Id.* (quoting *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982)).

Here, unlike in *Stone*, the issue is not whether the speedy-trial clock begins at Youngblood's arrest for the misdemeanor or at his indictment. Rather, the issue is simply which arrest starts the clock. This case is further distinguishable because, after a brief investigation—approximately two weeks—Trooper French requested arrest warrants for both the misdemeanor offense and the felony offense on the same day. Indeed, the officer's investigative report—dated February 10, 2021—charges Youngblood with both offenses for the same criminal conduct. At trial, the officer testified that he sought the misdemeanor arrest warrant from the justice court but that

12

the felony arrest warrant had to be requested from the Hood County District Attorney's Office, "[s]o they're not going to come - - the warrants are not going to be out at the same time." There was no novel question that the State had to consider before pursuing the felony charge. The mere fact that the district attorney's office took longer to prepare the felony warrant than the justice court took to sign the misdemeanor warrant should have no bearing on when Youngblood became an "accused." Giving each of Youngblood's charges its own relevant time period for assessing the delay would subject him to nearly ceaseless pre-trial delay. Accordingly, we conclude that Youngblood became an "accused" on the date of his initial arrest—April 29, 2021.

But even if we did not reach this conclusion, "[g]enerally, a delay of eight months to a year, or longer, is presumptively prejudicial and triggers a speedy[-]trial analysis." *Lopez*, 631 S.W.3d at 114 (first citing *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003); and then citing *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992)); *see also Dragoo*, 96 S.W.3d at 314 ("In general, courts deem delay approaching one year to be 'unreasonable enough to trigger the *Barker* enquiry.'" (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1 (1992))). Therefore, even if we do not measure the time between April 29, 2021—Youngblood's initial arrest—and August 28, 2021—Youngblood's felony arrest—the almost year-long delay between Youngblood's felony arrest and the start of his trial

would still be presumptively prejudicial and trigger an analysis of the remaining *Barker* factors. This factor weighs against the State.

## 2. Reasons for the Delay

The State has the burden of justifying the length of the delay. *Cantu*, 253 S.W.3d at 280; *Wade v. State*, No. 02-21-00125-CR, 2023 WL 2534468, at *5 (Tex. App.—Fort Worth Mar. 16, 2023, pet. ref'd) (mem. op., not designated for publication). When assessing this factor—reasons for delay—different weight is given to different reasons. *Gonzales*, 435 S.W.3d at 809; *Cochnauer*, 2021 WL 3931914, at *3. For instance, deliberate conduct by the State will weigh more heavily against the State than more neutral reasons such as negligence or overcrowded dockets. *Gonzales*, 435 S.W.3d at 809; *Cochnauer*, 2021 WL 3931914, at *3. But "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. If the State fails to give a reason for delay, the factor will be considered neutral and weigh slightly against the State. *Dragoo*, 96 S.W.3d at 314. And as with the triggering point for a full-*Barker* analysis, a justifiable reason for delay in a complex case may not be a justifiable reason in a simple case. *Gonzales*, 435 S.W.3d at 810; *Wade*, 2023 WL 2534468, at *5.

At the March 22, 2022 hearing on Youngblood's second motion for a speedy trial, the State provided no justification for the delay. When the trial court held a status hearing on May 5, 2022, to inform Youngblood that his May 9, 2022 trial setting was further delayed, it was the trial court that provided a justification for the

14

delay: a CPS trial that began on May 2, 2022, was "taking a long time and w[ould] not finish" before May 9, 2022. At the hearing on Youngblood's motion to dismiss, the trial court provided the same justification when it denied Youngblood's motion.

On appeal, the State appears to blame the delay on Youngblood's colliding with Reagan's car ten months into the COVID-19 pandemic when "[e]very court in the state was experiencing significant backlogs." But our analysis concerns only the trial court in this case, and the State offers no evidence to support its broad, two-sentence COVID-19 justification. There is no evidence—and the State does not assert—that the trial court ceased criminal matters during the pandemic, and if it did, the State does not explain the extent or duration of the cessation. It is also unclear whether the trial court or the district attorney's office used virtual methods, such as Zoom, to allow criminal matters to move forward, as several other courts in the state had done. "Not having that information matters because 'even in a pandemic, the Constitution cannot be put away and forgotten.'" *Wade*, 2023 WL 2534468, at *7 (quoting *Duc Minh Huynh v. State*, No. 05-21-00991-CR, 2022 WL 17261155, at *5 (Tex. App.—Dallas Nov. 29, 2022, pet. ref'd) (mem. op., not designated for publication)); *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam).

The State also argues that Youngblood's May 9, 2022 trial setting was "preempted by a Child Protective Services case that could not be postponed" and that his case was specially set at the next available setting after a continuous sexual abuse case that had been specially set in June. The State offers no evidence in support of its

15

argument. Nor does the State cite any authority supporting its contention that CPS matters must be prioritized over criminal matters. Indeed, "a crowded court docket is not a valid reason for delay." *Shaw*, 117 S.W.3d at 890.

The majority of the State's argument attempting to justify the delay is that Youngblood's litigation strategy was directly responsible for the delay.[5] Referring to Youngblood's pre-trial motions, the State contends that the delay was simply a "necessary consequence of [Youngblood's] extensive pre-trial litigation." The record does not show that Youngblood's pre-trial litigation was "extensive"—it consists of only seventy-seven pages of hearing transcript on his pre-trial motions—and the State cites to no authority that a defendant's pre-trial evidentiary motions or motions for a speedy trial constitute a waiver of the speedy-trial claim. *Cf. Vermont v. Brillon*, 556 U.S. 81, 93–94, 129 S. Ct. 1283, 1292 (2009) (finding no speedy-trial violation when defendant was appointed at least six attorneys and "aggressively" sought to dismiss his attorney on the eve of trial); *Wade v. State*, 83 S.W.3d 835, 839 (Tex. App.—Texarkana 2002, no pet.) (finding no speedy-trial violation when reason for delay was defendant's ignoring his duties under his community supervision).

The State had the burden to justify the reasons for the delay. Youngblood's criminal case was not complex, and the reasons provided by the State do not justify the length of the delay. Even if it had, the State's initial failure to provide a reason for

---

[5]Notably, the State raises this argument for the first time on appeal; it provided no such justification at either the hearing on Youngblood's motion for a speedy trial or the hearing on his motion to dismiss.

the delay and the trial court's overcrowded docket would still weigh against the State, though less heavily than deliberate conduct. This factor weighs against the State.

### 3. Assertion of the Right

The third factor—assertion of the speedy-trial right—concerns whether and how the defendant asserts the right. *Gonzales*, 435 S.W.3d at 810; *Cochnauer*, 2021 WL 3931914, at *4. The defendant bears the burden to show that he timely asserted his right. *Cantu*, 253 S.W.3d at 280, 282–83. Any delay in asserting a speedy-trial right weighs against a defendant, as does requesting dismissal rather than trial. *See Dragoo*, 96 S.W.3d at 314–15; *see also Cochnauer*, 2021 WL 3931914, at *4 (filing for dismissal after trial court granted defendant's request for speedy trial undermined defendant's claim of speedy-trial violation because it showed a desire for no trial instead of a speedy trial). But "[r]epeated requests for a speedy trial weigh heavily in favor of the defendant." *Cantu*, 253 S.W.3d at 283.

Here, the record shows that Youngblood first asserted—or at least attempted to assert—the right on October 25, 2021, when he sought a writ of mandamus with this court requesting, among other things, a speedy trial. Youngblood filed his first motion for a speedy trial on November 22, 2021. After the trial court granted Youngblood's request to represent himself, he filed a pro se motion for a speedy trial on February 7, 2022, which the trial court finally heard on March 22, 2022. Neither of Youngblood's speedy-trial motions sought dismissal, nor did his application for writ of mandamus. On May 17, 2022, after his May 9, 2022 trial setting had been extended

17

to July 11, 2022, and thirteen months after his initial arrest, Youngblood filed a motion to dismiss asserting that his right to a speedy trial had been violated. Throughout his case, Youngblood also made several requests on the record that his case be set for trial at three separate hearings before filing his motion to dismiss.

Youngblood diligently sought a speedy trial. He first asserted his right in the trial court in a motion for a speedy trial—not a dismissal—within seven months of his initial arrest and less than two months after he was formally charged. *Cf. id.* at 283–84 (acknowledging that "one cannot file a motion for a speedy trial until formal charges are made" and that an accused may "wait until he is charged, then file a motion for a speedy trial, . . . then file a motion to dismiss because he has diligently sought what he is entitled to"). Youngblood then asserted his speedy-trial right several times. His motions unequivocally requested a speedy trial and were considered by the trial court, and in response, the trial court set a trial date. Only after he had requested a speedy trial several times did he seek a dismissal. Moreover, the State concedes that Youngblood "certainly asserted his right to a speedy trial." We conclude that Youngblood asserted his right and that his repeated requests for a speedy trial weigh heavily in Youngblood's favor.

### 4. Prejudice

The final *Barker* factor—prejudice—is assessed in light of what the speedy-trial right is designed to prevent: oppressive pretrial incarceration, a defendant's anxiety and concern, or impairment of a defense. *Dragoo*, 96 S.W.3d at 315. Impairment of a

18

defense is the most serious, as an inability to adequately prepare for trial skews the fairness of the justice system. *Id.* (citing *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193). Actual prejudice is not required, but the defendant must show some prejudice caused by the delay. *McCarty v. State*, 498 S.W.2d 212, 218 (Tex. Crim. App. 1973) (citing *Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973)). If the defendant makes a prima facie showing of prejudice, the burden shifts to the State to prove that the defendant "suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Munoz*, 991 S.W.2d at 826 (quoting *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973)).

Here, Youngblood claims prejudice in that the delay both cost him personally and caused his defense to suffer. He asserts that he missed several important family events, including weddings and funerals, and that witnesses' memories of exculpatory events following the collision had faded during the delay. At the hearing on his motion to dismiss, Youngblood argued that he had been harmed by the delay because he had to wait through multiple appointed attorneys, that he had missed his daughter's birthdays and Father's Days, and that the additional extension on his trial date caused him further harm. The State does not respond or otherwise address this element, nor does it attempt to rebut the presumptive prejudice of the delay. *See Zamorano v. State*, 84 S.W.3d 643, 654–55 (Tex. Crim. App. 2002) (finding the defendant entitled to relief where the State's negligence caused the prejudicial delay and it did not "rebut, explain, or minimize the presumption of prejudice").

19

At trial, Youngblood's defense was that he did stop to check on Reagan following the collision. Youngblood testified at his own trial and disputed the State's claim that he did not check on Reagan immediately after the collision. According to Youngblood, he got out of his vehicle and went to Reagan's window to ask if he was okay. Reagan responded, "Yes," and Youngblood confirmed that Reagan's only injury was the cut on his nose and that he did not need an ambulance. Youngblood contends that he drove away from the scene of the collision only after making sure that Reagan was okay.

On cross-examination, Youngblood questioned Reagan's memory of the incident. In response to Youngblood's questioning, Reagan first testified that "nobody approached [his] vehicle that night." He then stated that the owner of a body shop near the scene of the collision approached him to ask if he was okay, if he needed an ambulance, or if he needed to go to the hospital. Youngblood then asked Reagan, "Would it surprise you to know that that was me that came to your car door?" Reagan responded, "I wouldn't remember too well."[6]

Lieutenant Blake Martin from the volunteer fire department also testified. The State questioned him about the fire department's response to the scene of the collision and about his observations. When asked if he observed Reagan at the scene,

---

[6]On redirect, the State sought to clarify Reagan's statement that he did not remember who approached his vehicle to check on him by offering that it was the owner of the body shop that checked on him, and Reagan simply agreed despite previously questioning his memory.

Martin responded, "Honestly, I do not remember." When asked if Reagan had been treated by someone else in the fire department, Martin referred to the fire department's report from the collision and vaguely responded, "I believe so."

Youngblood represented himself, pro se, and he was incarcerated from the time of his initial arrest up until the date of his trial. "Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself." *Marion*, 404 U.S. at 322, 92 S. Ct. at 464; *see also United States v. Edwards*, 577 F.2d 883, 889 (5th Cir. 1978) ("[I]n order to prejudice the defense to the extent necessary to constitute a speedy[-]trial violation, the faded memory must substantially relate to a material fact in issue."). Because the failure to stop was material in Youngblood's conviction, we conclude that Youngblood was prejudiced by the delay. Accordingly, this factor weighs against the State.

### 5. Balancing the *Barker* Factors

Taken together, the *Barker* factors demonstrate a speedy-trial violation. First, the delay was presumptively prejudicial with or without the inclusion of Youngblood's initial arrest. Second, the State bore the burden of proof to justify the delay and wholly failed to do so; in any event, the delay was the result of neutral factors such as the trial court's overcrowded docket, which would still weigh against the State. Third, Youngblood diligently sought a speedy trial, and his repeated requests for a speedy trial weigh heavily in Youngblood's favor. Finally, the record indicates that

21

Youngblood was prejudiced by the delay, which the State failed—indeed did not attempt—to rebut. This simple prosecution may have been of little moment to the State, but it mattered greatly to Youngblood. *See Zamorano*, 84 S.W.3d at 655 (citing *Doggett*, 505 U.S. at 657, 112 S. Ct. at 2693). We conclude that Youngblood's constitutional right to a speedy trial was violated. We sustain his first issue.

### III. Conclusion

Having sustained Youngblood's Sixth Amendment issue, we do not reach his second issue. *See* Tex. R. App. 47.1. We reverse Youngblood's conviction and render a judgment of acquittal.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 13, 2023

22